United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 7, 2001 Decided February 19, 2002 

 No. 00-1222

 Fox Television Stations, Inc., 
 Petitioner

 v.

 Federal Communications Commission and 
 United States of America, 
 Respondents

 National Association of Broadcasters, et al., 
 Intervenors

 Consolidated with 
 00-1263, 00-1326, 00-1359, 00-1381, 01-1136

 On Petitions for Review of an Order of the 
 Federal Communications Commission

 Edward W. Warren and Paul T. Cappuccio argued the 
cause for petitioners. With them on the joint briefs were 

Bruce D. Sokler, Richard A. Cordray, Ashley C. Parrish, 
Ellen S. Agress, Diane Zipursky, Michael D. Fricklas, Mark 
C. Morril, John G. Roberts, Jr., Stuart W. Gold, Laurence H. 
Tribe, Jonathan S. Massey, Arthur H. Harding, R. Bruce 
Beckner and Henk Brands. Jay Lefkowitz entered an ap-
pearance.

 C. Grey Pash, Jr., Counsel, Federal Communications Com-
mission, argued the cause for respondents. With him on the 
brief were Jane E. Mago, General Counsel, Daniel M. Arm-
strong, Associate General Counsel, James M. Carr, Lisa S. 
Gelb and Roger D. Citron, Counsel, Mark B. Stern and Jacob 
M. Lewis, Attorneys, U.S. Department of Justice. Christo-
pher J. Wright, General Counsel, Federal Communications 
Commission, Robert B. Nicholson and Robert J. Wiggers, 
Attorneys, U.S. Department of Justice, entered appearances.

 Robert A. Long, Jr. argued the cause for intervenors 
National Association of Broadcasters and the Network Affili-
ated Stations Alliance. With him on the brief was Jack N. 
Goodman.

 Harold J. Feld, Andrew J. Schwartzman and Cheryl A. 
Leanza were on the brief for intervenors/amici curiae Con-
sumer Federation of America and United Church of Christ, 
Office of Communication, Inc. Wade H. Hargrove, Jr. entered 
an appearance.

 Before: Ginsburg, Chief Judge, Edwards and Sentelle, 
Circuit Judges.

 Opinion for the Court filed by Chief Judge Ginsburg.

 

 Table of Contents
 
 Page
 Introduction 3
 
 I. Background 4
 A. The National Television Station Ownership (NTSO) Rule 5
 

 Page
 B. The Cable/Broadcasting Cross-Ownership (CBCO) Rule 6
 C. Applying s 202(h) 7
 1. The NTSO Rule 9
 2. The CBCO Rule 9
 
 II. Threshold Issues 10
 A. Finality 10
 B. Reviewability 12
 C. Ripeness 13
 D. Exhaustion and Standing 15
 
 III. The NTSO Rule 16
 A. Section 202(h) and the APA 16
 1. Is the Rule irrational? 16
 2. Failure to comply with s 202(h) 22
 3. Failure to address the 1984 Report 22
 B. The First Amendment 23
 C. Remedy 27
 
 IV. The CBCO Rule 30
 A. Section 202(h) and the APA 31
 1. Competition 31
 2. Diversity 33
 B. Remedy 35
 
 V. Conclusion 37
 
 Ginsburg, Chief Judge: Before the court are five consoli-
dated petitions to review the Federal Communications Com-
mission's 1998 decision not to repeal or to modify the national 
television station ownership rule, 47 C.F.R. s 73.3555(e), and 
the cable/broadcast cross-ownership rule, 47 C.F.R. 
s 76.501(a). Petitioners challenge the decision as a violation 
of both the Administrative Procedure Act (APA), 5 U.S.C. 
s 551 et seq., and s 202(h) of the Telecommunications Act of 
1996, Pub. L. No. 104-104, 110 Stat. 56. They also contend 
that both rules violate the First Amendment to the Constitu-
tion of the United States. The network petitioners -- Fox 
Television Stations, Inc., National Broadcasting Company, 

Inc., Viacom Inc., and CBS Broadcasting Inc. -- address the 
national television ownership rule, while petitioner Time War-
ner Entertainment Company, L.P. addresses the cable/broad-
cast cross-ownership rule. The National Association of 
Broadcasters (NAB), the Network Affiliated Stations Alliance 
(NASA), the Consumer Federation of America (CFA), and 
the United Church of Christ, Office of Communications, Inc. 
(UCC) have intervened and filed briefs in support of the 
Commission's decision to retain the national television station 
ownership rule.

 We conclude that the Commission's decision to retain the 
rules was arbitrary and capricious and contrary to law. We 
remand the national television station ownership rule to the 
Commission for further consideration, and we vacate the 
cable/broadcast cross-ownership rule because we think it un-
likely the Commission will be able on remand to justify 
retaining it.

 I. Background

 In the Telecommunications Act of 1996 the Congress set in 
motion a process to deregulate the structure of the broadcast 
and cable television industries. The Act itself repealed the 
statutes prohibiting telephone/cable and cable/broadcast 
cross-ownership, 1996 Act ss 302(b)(1), 202(i), and overrode 
the few remaining regulatory limits upon cable/network cross-
ownership, id. s 202(f)(1). In radio it eliminated the national 
and relaxed the local restrictions upon ownership, id. 
s 202(a), (b), and eased the "dual network" rule, id. s 202(e). 
In addition, the Act directed the Commission to eliminate the 
cap upon the number of television stations any one entity may 
own, id. s 202(c)(1)(A), and to increase to 35 from 25 the 
maximum percentage of American households a single broad-
caster may reach, id. s 202(c)(1)(B).

 Finally, and most important to this case, in s 202(h) of the 
Act, the Congress instructed the Commission, in order to 
continue the process of deregulation, to review each of the 
Commission's ownership rules every two years:

 The Commission shall review its rules adopted pursuant 
 to this section and all of its ownership rules biennially as 
 part of its regulatory reform review under section 11 of 
 the Communications Act of 1934 and shall determine 
 whether any of such rules are necessary in the public 
 interest as the result of competition. The Commission 
 shall repeal or modify any regulation it determines to be 
 no longer in the public interest.
 
The Commission first undertook a review of its ownership 
rules pursuant to this mandate in 1998. This case arises out 
of the resulting decision not to repeal or to modify two 
Commission rules: the national television station ownership 
rule and the cable/broadcast cross-ownership rule.

A. The National Television Station Ownership (NTSO) Rule

 The NTSO Rule prohibits any entity from controlling tele-
vision stations the combined potential audience reach of which 
exceeds 35% of the television households in the United 
States.* As originally promulgated in the early 1940s, the 
Rule prohibited common ownership of more than three televi-
sion stations; that number was later increased to seven. 
Amendment of Multiple Ownership Rules, Report & Order, 
100 F.C.C.2d 17, p p 14, 16 (1984) (1984 Report). The stated 
purpose of the seven-station rule was "to promote diversifica-
tion of ownership in order to maximize diversification of 
program and service viewpoints" and "to prevent any undue 
concentration of economic power." Id. p 17.

 In 1984 the Commission considered the effects of techno-
logical changes in the mass media, id. p 4, and repealed the 
NTSO Rule subject to a six-year transition period during 
which the ownership limit was raised to 12 stations. Id. 

__________
 * "No license for a commercial TV broadcast station shall be 
granted, transferred or assigned to any party (including all parties 
under common control) if the grant, transfer or assignment of such 
license would result in such party or any of its stockholders, 
partners, members, officers or directors, directly or indirectly, 
owning, operating or controlling, or having a cognizable interest in 
TV stations which have an aggregate national audience reach 
exceeding thirty-five (35) percent." 47 C.F.R. s 73.3555(e).

p p 108-112. The Commission determined that repeal of the 
NTSO Rule would not adversely affect either the diversity of 
viewpoints available on the airwaves or competition among 
broadcasters. It concluded that diversity should be a concern 
only at the local level, as to which the NTSO Rule was 
irrelevant, id. p p 31-32, and that "[l]ooking at the national 
level [the Rule was unnecessary because] the U.S. enjoys an 
abundance of independently owned mass media outlets," id. 
p 43. The Commission also concluded that group owners 
were not likely to impose upon their stations a "monolithic" 
point of view. Id. p p 52-54, 61. With respect to economic 
competition, the Commission considered the markets for na-
tional and for local spot advertising and concluded that nei-
ther would be made less competitive by repeal of the NTSO 
Rule. Id. p p 66-71.

 Implementation of the 1984 Report was subsequently 
blocked by the Congress. See Second Supplemental Appro-
priations Act, Pub. L. No. 98-396, s 304, 98 Stat. 1369, 1423 
(1984). The Commission thereupon reconsidered the matter 
and prohibited common ownership (1) of stations that in the 
aggregate reached more than 25% of the national television 
audience, and (2) of more than 12 stations regardless of their 
combined audience reach. Amendment of Multiple Owner-
ship Rules, Mem. Op. & Order, 100 F.C.C.2d 74, p p 36-40 
(1984). These limitations remained in place until 1996, when 
the Congress (in s 202(c)(1) of the Act) directed the Commis-
sion to eliminate the 12-station rule and to raise to 35% the 
cap upon audience reach, both of which actions the Commis-
sion promptly took. Implementation of Sections 202(c)(1) 
and 202(e) of the Telecommunications Act of 1996 (National 
Broadcast Television Ownership and Dual Network Opera-
tions), 61 Fed. Reg. 10,691 (Mar. 15, 1996).

B. The Cable/Broadcast Cross-Ownership (CBCO) Rule

 The CBCO Rule prohibits a cable television system from 
carrying the signal of any television broadcast station if the 
system owns a broadcast station in the same local market.* 

__________
 * "No cable television system (including all parties under common 
control) shall carry the signal of any television broadcast station if 

In conjunction with certain "must-carry" requirements, 47 
U.S.C. ss 534-535; 47 C.F.R. s 76.55 et seq., to which cable 
operators are subject, see Turner Broad. Sys., Inc. v. FCC, 
512 U.S. 622, 630-32 (1994) (Turner I), the Rule has the effect 
of prohibiting common ownership of a broadcast station and a 
cable television system in the same local market.

 The Commission first promulgated the CBCO Rule in 1970 
along with a rule banning network ownership of cable sys-
tems. Amendment of Part 74, Subpart K, of the Commis-
sion's Rules and Regulations Relative to Community Anten-
na Television Systems, Second Report & Order, 23 F.C.C.2d 
816, p p 11, 15 (1970). In 1984 the Congress codified the 
CBCO Rule but not the network ownership ban. Cable 
Communications Policy Act of 1984, Pub. L. No. 98-549, s 2, 
98 Stat. 2779.

 In 1992 the Commission repealed the rule prohibiting net-
work ownership of cable systems. Amendment of Part 76, 
Subpart J, Section 76.501 of the Commission's Rules and 
Regulations, Report & Order, 7 F.C.C.R. 6156, p 10 (1992) 
(1992 Report). The Commission also revisited the CBCO 
Rule and concluded that "the rationale for an absolute prohi-
bition on broadcast-cable cross-ownership is no longer valid in 
light of the ongoing changes in the video marketplace." Id. 
p 17. Because the Congress had imposed a similar prohibi-
tion by statute, however, the Commission did not repeal the 
Rule; instead, the Commission recommended that the Con-
gress repeal the statutory prohibition. Id. In the 1996 Act 
the Congress did just that without, however, requiring the 
Commission to repeal the CBCO Rule. 1996 Act s 202(i).

C. Applying s 202(h)

 As mentioned above, the 1996 Act, in addition to raising the 
national ownership cap to 35% and repealing the statutory 

__________
such system directly or indirectly owns, operates, controls, or has 
an interest in a TV broadcast station whose predicted Grade B 
contour, computed in accordance with s 73.684 of part 73 of this 
chapter, overlaps in whole or in part the service area of such system 
(i.e., the area within which the system is serving subscribers)." 47 
C.F.R. s 76.501(a).

ban upon cable/broadcast cross-ownership, required the Com-
mission biennially to review all its ownership rules in order to 
determine whether they remain "necessary in the public 
interest." To begin the first review thus called for in 
s 202(h), the Commission, on March 13, 1998, issued a Notice 
of Inquiry seeking comments on all ownership rules, including 
specifically both the NTSO and the CBCO Rules. 1998 
Biennial Regulatory Review, Notice of Inquiry, 13 F.C.C.R. 
11276, p p 14, 43 (1998). The Commission described as fol-
lows the approach it intended to take:

 We solicit comment on our broadcast ownership rules to 
 determine whether these rules are no longer in the 
 public interest as we have traditionally defined it in 
 terms of our competition and diversity goals. Once this 
 phase is completed, we will review the comments and 
 issue a report. In the event we conclude there is good 
 reason to believe that any of the rules within the scope of 
 the review, or portions thereof, should be repealed or 
 modified, we will issue the appropriate Notice(s) of Pro-
 posed Rule Making.
 
Id. p 3.

 Reply comments were filed in June, 1998 but as of the fall 
of 1999 the Commission had not yet completed its review. 
Therefore, in November, 1999 the Congress directed that: 
"Within 180 days ... [the] Commission shall complete the 
first biennial review required by section 202(h) of the Tele-
communications Act of 1996." Consolidated Appropriations 
Act, 2000, Pub. L. No. 106-113, s 5003, 113 Stat. 1501, 
1501A-593 (1999). The accompanying Conference Report 
instructed: "[I]f the Commission concludes that it should 
retain any of these rules under the review unchanged the 
Commission shall issue a report that includes a full justifica-
tion of the basis for so finding." H.R. Conf. Rep. No. 106-464, 
at 148 (1999).

 On May 26, 2000 the Commission announced its decision 
(by a 3-2 vote) to retain the NTSO and CBCO Rules, among 
others, and to repeal or to modify certain other of its owner-
ship rules. A few weeks later the Commission issued a 

written report in which it explained its actions. 1998 Bienni-
al Regulatory Review, Biennial Review Report, 15 F.C.C.R. 
11058 (2000) (1998 Report).

 1. The NTSO Rule
 
 The Commission gave three primary reasons for retaining 
the NTSO Rule: (1) to observe the effects of recent changes 
to the rules governing local ownership of television stations; 
(2) to observe the effects of the increase in the national 
ownership cap to 35%; and (3) to preserve the power of 
affiliates in bargaining with their networks and thereby allow 
the affiliates to serve their local communities better. Id. 
p p 25-30. The Commission also stated that it believed re-
pealing the rule would "increase concentration in the national 
advertising market" -- presumably to the detriment of com-
petition -- and "enlarge the potential for monopsony power in 
the program production market" -- presumably to the detri-
ment of both competition and diversity. Id. p 26 n.78. Com-
missioners Furchtgott-Roth and Powell dissented. Id. at 74; 
id. at 94.

 The effect upon petitioners Fox and Viacom of the Commis-
sion's decision to retain the NTSO Rule was direct and 
immediate. Viacom's acquisition of CBS brought its audience 
reach to 41%; only a stay issued by this court has enabled 
Viacom to avoid divesting itself of enough stations to come 
within the 35% cap. Fox Television Stations, Inc. v. FCC, 
No. 00-1222 at 2 (April 6, 2001). Similarly, the Rule is 
preventing Fox from going forward with its purchase of 
Chris-Craft Industries, which purchase would enable Fox to 
reach more than 40% of the national audience.

 2. The CBCO Rule
 
 In the 1998 Report the Commission decided that retaining 
the CBCO Rule was necessary to prevent cable operators 
from favoring their own stations and from discriminating 
against stations owned by others. 1998 Report p 104 ("cur-
rent carriage and channel position rules prevent some of the 
discrimination problems, but not all of them"). The Commis-
sion also determined that the CBCO Rule was "necessary to 

further [the] goal of diversity at the local level." Id. p 106. 
The Rule, according to the Commission, contributes to the 
diversity of viewpoints in local markets by preserving the 
voices of independent broadcast stations, which provide local 
news and public affairs programming. Id. p p 106-108. Com-
missioners Furchtgott-Roth and Powell dissented from the 
retention of this Rule as well. Id. at 74; id. at 100.

 The effect upon Time Warner of the Commission's decision 
to retain the CBCO Rule was significant. Although Time 
Warner has not identified any specific transaction it would 
have consummated but for the CBCO Rule, the Rule is 
preventing it from acquiring television stations in markets, 
such as New York City, where it owns a cable system. Time 
Warner asserts that "obvious procompetitive efficiencies" 
would result from "combining" a television station in that 
area with its all-local-news cable programming service, NY1. 
Time Warner also argues that the CBCO Rule hinders its 
"WB" network from competing with networks that own sta-
tions in major television markets.

 II. Threshold Issues

 Before turning to the merits of the petitions we must 
consider several threshold issues. The Commission, sup-
ported by the intervenors, contends that its decision not to 
repeal or to modify the Rules is not final agency action, was 
not meant by the Congress to be subject to review, and in any 
event is not ripe for review. Intervenors NAB and NASA 
also argue that the petitioners failed to exhaust their adminis-
trative remedies and lack standing.

A. Finality

 This court has jurisdiction to review "final orders" of the 
Commission and "final agency action for which there is no 
other adequate remedy in a court." 28 U.S.C. s 2342(1); 5 
U.S.C. s 704. Consequently, the court must determine 
whether the Commission's determination was "final." Agen-
cy action is final if: (1) it is "the consummation of the 
agency's decisionmaking process," and (2) "rights or obli-
gations have been determined" by the action or "legal conse-

quences will flow" from it. Bennett v. Spear, 520 U.S. 154, 
178 (1997). The Commission argues that its retention deci-
sion does not meet this test; the networks and Time Warner 
argue persuasively to the contrary.

 There is no question a Commission determination not to 
repeal or to modify a rule, after giving notice of and receiving 
comment upon a proposal to do so, is a final agency action 
subject to judicial review. Montana v. Clark, 749 F.2d 740, 
744 (D.C. Cir. 1985). Equally clear, an agency's denial of a 
petition to initiate a rulemaking for the repeal or modification 
of a rule is a final agency action subject to judicial review. 
Capital Network Sys., Inc. v. FCC, 3 F.3d 1526, 1530 (D.C. 
Cir. 1993). The question presented here is whether the 
Commission's determination not to repeal the NTSO and 
CBCO Rules, made pursuant to s 202(h) after issuing a 
"Notice of Inquiry" and receiving comment, is likewise a final 
agency action subject to judicial review.

 The Commission first appears to contend that only a deci-
sion made pursuant to an adjudicative or rulemaking proceed-
ing is final. The Commission fails, however, either to offer 
support for this argument or to acknowledge that we have 
held other types of agency actions to be final and reviewable. 
See, e.g., Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 435-37 
(1986) (holding letter expressing EPA's position on procedur-
al question was final agency action because it was definitive 
and had direct and immediate effect upon petitioners); Nat'l 
Automatic Laundry and Cleaning Council v. Schultz, 443 
F.2d 689, 702 (1971) (holding letter from Administrator of 
Wage and Hour Division of Department of Labor interpreting 
provision of Fair Labor Standards Act was final agency 
action).

 Second, the Commission argues that the 1998 Report is not 
final because the agency intends to continue considering the 
ownership rules. That, however, does not mean the determi-
nation is not "final" as a matter of law. The 1998 Report is 
the Commission's last word on whether, as of 1998, the Rules 
were still "necessary in the public interest as the result of 
competition."

 Finally, the Commission says the 1998 Report does not 
impose an obligation or deny a right because the petitioners 
would receive no immediate relief if they were to prevail in 
their present challenge; all they could get would be an order 
requiring the Commission to initiate a rulemaking. We shall 
have more to say below about the relief to which the petition-
ers are entitled. For now it is sufficient to observe that by 
the Commission's own account its decision is, in effect, at the 
least a decision not to initiate a rulemaking, and it is estab-
lished that "an agency's refusal to institute [rulemaking] 
proceedings has sufficient legal consequence to meet the 
second criterion of the finality doctrine." Capital Network 
Sys., 3 F.3d at 1530. Therefore we conclude, as we must, 
that the decision under review -- holding that the NTSO and 
CBCO Rules were necessary in the public interest -- is a 
final agency action.

B. Reviewability

 Separate from the question whether the 1998 decision is a 
final agency action, the Commission argues that the "Con-
gress did not intend for the Commission's biennial reviews 
... to create reviewable action." In support of this proposi-
tion, the Commission notes that s 202(c)(2) of the 1996 Act 
calls for the Commission to conduct a rulemaking to deter-
mine whether to retain, to modify, or to eliminate local 
television ownership limitations; in contrast, s 202(h) re-
quires only that the Commission "review" rules to determine 
whether to repeal or to modify them. The Commission next 
argues that under the 1996 Act a "determination," unlike a 
rulemaking decision, is not a reviewable event. It contends 
that if the Congress had wanted to subject to judicial scrutiny 
determinations made pursuant to the biennial reviews re-
quired by s 202(h), then it would have said so, as it said in 
s 252(e)(6) of the Act that a state commission's "determina-
tion" approving or disapproving an interconnection agreement 
shall be reviewable in federal court. Additionally, the Com-
mission observes that s 202(h) does not require it to submit a 
written report to the Congress. All this, according to the 
agency, indicates the Congress did not intend that the courts 
review agency determinations made pursuant to s 202(h). In 

any event, the Commission argues, under Chevron, U.S.A., 
Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 
(1984), the court must defer to the Commission's statutory 
interpretation to that effect. Finally, the Commission con-
tends that if its every decision to retain a rule under s 202(h) 
were subject to judicial review, then the agency and the 
courts alike would face tasks so overwhelming as not to be a 
result sensibly ascribed to the Congress.

 In light of the presumption that final agency action is 
reviewable, see Abbott Labs. v. Gardner, 387 U.S. 136, 140-41 
(1967), we must reject the Commission's argument that the 
text and structure of the 1996 Act preclude judicial review. 
The contrasts the Commission draws between s 202(c) and 
s 202(h), and between s 252 and s 202(h), fall short of the 
"clear and convincing evidence" of congressional intent need-
ed to foreclose review under Abbott Labs., 387 U.S. at 141. 
Nor is an agency's interpretation of a statutory provision 
defining the jurisdiction of the court entitled to our deference 
under Chevron. Adams Fruit Co. v. Barrett, 494 U.S. 638, 
650 (1990). We appreciate that s 202(h) requires the Com-
mission to undertake a significant task in a relatively short 
time, but we do not see how subjecting the result to judicial 
review makes the Commission's responsibility significantly 
more burdensome, let alone so formidable as to be improba-
ble. In sum, having held that the 1998 decision is a final 
agency action, we see nothing in the 1996 Act that forecloses 
judicial review thereof.

C. Ripeness

 Next the Commission contends that its decision not to 
repeal or to modify the ownership rules in question is not ripe 
for review because the issues are not "fit" for judicial review, 
and delay would not cause the petitioners any hardship. See 
Abbott Labs., 387 U.S. at 149. First, the Commission points 
out that it is in a better position than the court to determine 
whether the challenged rules are necessary in the public 
interest. Second, the Commission argues that the petitioners 
will not be harmed if the 1998 Report is not subject to review 
because they can seek relief from the operation of the rules in 

other ways -- a petition for a rulemaking or a request for a 
waiver; and again, the relief available to the petitioners 
would be, in any event, only an order directing the Commis-
sion to conduct a rulemaking to consider modification or 
repeal of the challenged rules. In addition, intervenors CFA 
and UCC contend that the decision is not ripe for judicial 
review because they "and other interested parties have not 
yet had an opportunity to present responsive arguments 
relating [to the] rules here at issue."

 We find these arguments unpersuasive. First, the issues in 
this case are fit for judicial review because the questions 
presented are purely legal ones: whether the Commission's 
determination was arbitrary and capricious or contrary to 
law, and whether the challenged rules violate the First 
Amendment. Because the court will not review de novo the 
Commission's decision to retain the Rules, the Commission's 
argument that it is in the better position to make that 
determination is, while doubtless true, quite beside the point.

 Second, the petitioners will indeed be harmed if we do not 
review the Commission's decision now. Although they could 
challenge the Rules by other means, retention of the Rules in 
the interim significantly harms both the networks and Time 
Warner. As we have said, the NTSO Rule constrains Fox 
and Viacom from entering into or completing certain specific 
transactions, and the CBCO Rule prevents Time Warner 
from acquiring television stations in certain markets where it 
would like to do so. Moreover, the Commission is mistaken 
in asserting that the only remedy available to the petitioners 
is a remand for rulemaking. For the reasons we provide 
below (in Part III.C), we think that under s 202(h) a review-
ing court may vacate the underlying rule if it determines not 
only that the Commission failed to justify retention of the 
rule but that it is unlikely the Commission will be able to do 
so on remand.

 Finally, CFA, UCC, and all other interested parties were 
invited in the Notice of Inquiry to comment specifically upon 
whether the broadcast ownership rules should be retained. 
1998 Biennial Regulatory Review, Notice of Inquiry, 13 

F.C.C.R. 11276, p 3 (1998). Perhaps CFA and UCC, unlike 
the other intervenors and many members of the public, chose 
not to comment in anticipation of doing so if the Commission 
were later to propose repealing the Rules. Be that as it may, 
we do not see how that can make unripe an otherwise ripe 
issue or deprive those harmed of their right to timely review 
of a final agency action. Hence, we conclude the Commis-
sion's decision is ripe for review.

D. Exhaustion and Standing

 Intervenors NAB and NASA argue that the petitioners 
failed to exhaust their administrative remedies because they 
neither petitioned for a rulemaking to amend or repeal the 
Rules nor asked the Commission for a waiver of the Rules. 
They argue that in Tribune Co. v. FCC, 133 F.3d 61, 69 
(1998), this court "made clear that the exhaustion require-
ment applies to challenges launched against the ownership 
rules that are subject to the Commission's biennial review 
process." The intervenors' reliance upon the Tribune case is 
misplaced, however. When that case was decided the Com-
mission had not yet completed a review pursuant to s 202(h). 
In this case, where the Commission had just determined that 
the rules in question were still necessary in the public inter-
est, it obviously would have been futile for the petitioners to 
have petitioned the agency for a rulemaking to repeal them. 
And the intervenors cite no authority suggesting the petition-
ers were required to request a waiver from the agency even 
though a waiver is not the relief they seek from the court; 
nor do the intervenors proffer any reason to believe the 
petitioners would have been entitled to a waiver had they 
sought one.

 The intervenors also argue that the petitioners lack stand-
ing because a favorable decision in this case would not 
redress their injuries. Their point is that the Commission 
would still have to consider in a rulemaking whether to repeal 
the Rules, but as we have just seen in connection with the 
Commission's objection that this case is not ripe for review, 
that is not so. We therefore conclude that the petitioners 
have standing to bring their claims before the court.

 III. The NTSO Rule

 Having found no obstacle to our adjudication of this dis-
pute, we turn at last to the merits. The networks assert that 
the Commission's decision to retain the NTSO Rule was 
contrary to s 202(h) and arbitrary and capricious in violation 
of the APA; alternatively they contend the Rule violates the 
First Amendment.

A. Section 202(h) and the APA

 The networks argue that the Commission's decision not to 
repeal the NTSO Rule was arbitrary and capricious and 
contrary to s 202(h) for three reasons: (1) the Rule is 
fundamentally irrational, and the Commission's justifications 
for retaining it are correlatively flawed; (2) the Commission 
failed meaningfully to consider whether the Rule was "neces-
sary" in the public interest; and (3) the Commission failed to 
explain why it departed from its previous position that the 
Rule should be repealed.

 1. Is the Rule irrational?
 
 The networks advance three reasons for thinking that 
retention of the NTSO Rule was irrational: The 35% cap is if 
anything less justified than the aggregate limitation upon 
cable system ownership we held a violation of the First 
Amendment in Time Warner Entertainment Co., L.P. v. 
FCC, 240 F.3d 1126 (2001) (Time Warner II); the Commis-
sion has provided no persuasive reason to believe retention of 
the Rule is necessary in the public interest; and retention of 
the Rule is inconsistent with some of the Commission's other 
recent decisions.

 Time Warner II. According to the networks, "[t]he logic 
of Time Warner II applies with even greater force here." 
They contend that the television station ownership cap of 35% 
is more severe than the cable system ownership cap of 30% 
struck down in Time Warner II, because unlike cable systems 
"broadcasters face intense competition from numerous sta-
tions in each local market" and the 35% cap is measured in 
terms of homes potentially rather than actually served. In 
response, the Commission, supported by intervenors NAB 

and NASA, notes two distinctions between Time Warner II 
and this case: The 30% cap in Time Warner II was set by the 
Commission whereas the 35% cap at issue here was set by the 
Congress; and the provision of the Cable Act at issue in the 
prior case limited the extent to which the Commission could 
regulate in furtherance of diversity, whereas s 202(h) man-
dates that a rule necessary "in the public interest" -- includ-
ing the public interest in diversity -- be retained.

 The networks are right, of course, that a broadcaster faces 
more local competition than does a cable system. We must 
also acknowledge that under the cap expressed in terms of a 
"potential audience reach" of 35%, an owner of television 
stations cannot in practice achieve an audience share that 
approaches 35% of the national audience. Nonetheless, we 
find the networks' reliance upon Time Warner II less than 
convincing for two reasons, one advanced by the Commission 
and one not. As the Commission points out, we concluded in 
Time Warner II that the 1992 Cable Act limited the agency's 
authority to impose regulations solely in order to further 
diversity in programming, Time Warner II, 240 F.3d at 1135-
36, whereas no such limitation is at work in this case. See 
page 18 below. Additionally, in Time Warner II we reviewed 
the challenged regulations under first amendment "intermedi-
ate scrutiny," which is more demanding than the arbitrary 
and capricious standard of the APA. See Time Warner II, 
240 F.3d at 1130 ("a government regulation subject to inter-
mediate scrutiny will be upheld if it 'advances important 
government interests unrelated to the suppression of free 
speech and does not burden substantially more speech than 
necessary to further those interests' ") (quoting Turner 
Broad. Sys., Inc. v. FCC, 520 U.S. 180, 189 (1997)). In sum, 
although Time Warner II does give the court a point of 
reference, it is not controlling here.

 The Commission's reasons: competition, diversity, et al. 
The networks next argue that neither safeguarding competi-
tion nor promoting diversity generally can support the Com-
mission's decision to retain the NTSO Rule. They then take 
on the specific reasons given by the Commission in support of 
its 1998 decision.

 As to competition, the networks note that there is no 
evidence "that broadcasters have undue market power," such 
as to dampen competition, in any relevant market. The 
Commission attempts to rebut the point, but to no avail. In 
its brief the agency cites a single, barely relevant study by 
Phillip A. Beutel et al., entitled Broadcast Television Net-
works and Affiliates: Economic Conditions and Relation-
ship--1980 and Today (1995). Insofar as there is any point 
of tangency between that study and the matter at hand, it is 
in the authors' conclusion that "the available evidence tends 
to refute the proposition that affiliates have gained negotiat-
ing power since ... 1980." Id. at 12. The study plainly does 
not, however, suggest that broadcasters have undue market 
power. The only other evidence to which the Commission 
points is a table said to show that "many group owners have 
acquired additional stations and increased their audience 
reach since the Telecom Act's passage." 1998 Report p 27. 
As the networks point out, however, "such figures alone, 
without some tangible evidence of an adverse effect on the 
market, are insufficient to support retention of the Cap." 
Finally, the Commission's reference in the 1998 Report to the 
national advertising and the program production markets is 
wholly unsupported and undeveloped. 1998 Report p 26 n.78. 
Consequently, we must conclude, as the networks maintain, 
that the Commission has no valid reason to think the NTSO 
Rule is necessary to safeguard competition.

 As to diversity, the networks contend there is no evidence 
that "the national ownership cap is needed to protect diversi-
ty" and that in any event s 202(h) does not allow the Com-
mission to regulate broadcast ownership "in the name of 
diversity alone." The Commission, again supported by inter-
venors NAB and NASA, persuasively counters the statutory 
point: In the context of the regulation of broadcasting, "the 
public interest" has historically embraced diversity (as well as 
localism), see FCC v. Nat. Citizens Comm. for Broad., 436 
U.S. 775, 795 (1978) (NCCB), and nothing in s 202(h) signals 
a departure from that historic scope. The question, there-
fore, is whether the Commission adequately justified its re-
tention decision as necessary to further diversity or localism. 

In the 1998 Report the Commission mentioned national diver-
sity as a justification for retaining the NTSO Rule but never 
elaborated upon the point. 1998 Report p 26 n.78. This 
justification fails for two reasons. First, the Commission 
failed to explain why it was no longer adhering to the view it 
expressed in the 1984 Report that national diversity is irrele-
vant. 1984 Report p p 31-32. Second, the Commission's 
passing reference to national diversity does nothing to explain 
why the Rule is necessary to further that end. The Commis-
sion did, however, discuss at some length fostering local 
diversity by strengthening the bargaining position of affiliates 
vis-a-vis their networks, 1998 Report p 30, a justification to 
which we shall come shortly.

 As to the Commission's three more specific reasons for 
retaining the NTSO Rule, the networks contend that each is 
inadequate. The Commission stated that retaining the cap 
was necessary so it could: (1) observe the effects of recent 
changes in the rules governing local ownership of television 
stations; (2) observe the effects of the national ownership cap 
having been raised to 35%; and (3) preserve the power of 
local affiliates to bargain with their networks in order to 
promote diversity of programming. 1998 Report p p 25-30. 
We agree with the networks that these reasons cannot justify 
the Commission's decision.

 The first reason is insufficient because there is no obvious 
relationship between relaxation of the local ownership rule -- 
which now permits a single entity to own two broadcast 
stations in the same market in some situations, see Review of 
the Commission's Regulations Governing Television Broad-
casting, Report & Order, 14 F.C.C.R. 12903, p 64 (1999) -- 
and retention of the national ownership cap, and the Commis-
sion does nothing to suggest there is any non-obvious rela-
tionship. Furthermore, as the networks point out, neither 
the first nor the second reason is responsive to s 202(h): The 
Commission's wait-and-see approach cannot be squared with 
its statutory mandate promptly -- that is, by revisiting the 
matter biennially -- to "repeal or modify" any rule that is not 
"necessary in the public interest."

 The Commission, with the support of intervenors NAB and 
NASA, argues that it was required to defer to the decision of 
the Congress to set the initial ownership cap in the 1996 Act 
at 35%. For this the Commission relies upon both the House 
and the Senate having rejected a proposal to raise the cap to 
50%, and upon the statement of Congressman Markey, rank-
ing minority Member of the relevant subcommittee of the 
House, that the Congress's choice of the 35% cap "should 
settle the issue for many years to come." 142 Cong. Rec. 
H1145-06, H1170 (daily ed. Feb. 1, 1996). This legislative 
history is no basis whatever for the Commission's decision. 
First, the choice of 35% rather than any other number 
determined only the starting point from which the Commis-
sion was to assess the need for further change. Section 
202(h) itself requires the Commission to determine whether 
its ownership rules -- specifically including "rules adopted 
pursuant to this section," such as the present NTSO Rule -- 
are necessary in the public interest. Thus, the statute im-
posed upon the Commission a duty to examine critically the 
new 35% NTSO Rule and to retain it only if it continued to be 
necessary; for the Commission to defer to the Congress's 
choice of 35% as of 1996 is to default upon this ongoing duty. 
Second, "the remarks of a single legislator, even the sponsor," 
cannot be allowed to alter the plain meaning of the legislation 
upon which he comments. Chrysler Corp. v. Brown, 441 U.S. 
281, 311 (1979). In this instance, moreover, the congressman 
did not even purport to interpret the statute; he merely 
offered his own prediction that competitive conditions would 
not warrant a change in the Rule anytime soon. Maybe yes, 
maybe no. The statute says that is for the Commission to 
decide. Consequently, the first two reasons given by the 
Commission do nothing to support its decision.

 Nor does the Commission's third reason -- that the Rule is 
necessary to strengthen the bargaining power of network 
affiliates and thereby to promote diversity of programming -- 
have sufficient support in the present record. Although we 
do not agree with the networks that this reason is unrespon-
sive to s 202(h) -- as we have said, that section allows the 
Commission to retain a rule necessary to safeguard the public 

interest in diversity -- we must agree that the Commission's 
failure to address itself to the contrary views it expressed in 
the 1984 Report effectively undermines its present rationale. 
In the 1998 Report (p 30) the Commission asserted that 
independently-owned affiliates play a valuable role by "coun-
terbalancing" the networks' strong economic incentive in 
clearing all network programming "because they have the 
right ... to air instead" programming more responsive to 
local concerns. In the 1984 Report, however, the Commission 
said it had "no evidence indicating that stations which are not 
group-owned better respond to community needs, or expend 
proportionately more of their revenues on local program-
ming." 1984 Report p 53. The later decision does not indi-
cate the Commission has since received such evidence or 
otherwise found reason to repudiate its prior conclusion.

 In sum, we agree with the networks that the Commission 
has adduced not a single valid reason to believe the NTSO 
Rule is necessary in the public interest, either to safeguard 
competition or to enhance diversity. Although we agree with 
the Commission that protecting diversity is a permissible 
policy, the Commission did not provide an adequate basis for 
believing the Rule would in fact further that cause. We 
conclude, therefore, that the 1998 decision to retain the NTSO 
Rule was arbitrary and capricious in violation of the APA.

 Other Commission actions. The networks argue that the 
Commission's decision is also arbitrary and capricious be-
cause it is inconsistent with recent Commission decisions 
relaxing the local television station ownership and the ra-
dio/televison cross-ownership rules, as well as its decisions 
repealing the prime time access and the financial and syndica-
tion rules. The Commission answers that it has properly 
followed the lead of the Congress in taking an "incremental" 
approach to the deregulation of broadcast ownership. Al-
though we are not convinced the Congress required such an 
approach -- the mandate of s 202(h) might better be likened 
to Farragut's order at the battle of Mobile Bay ("Damn the 
torpedoes! Full speed ahead.") than to the wait-and-see 
attitude of the Commission -- because the decisions to which 
the networks point deal with regulations that are not closely 

related, analytically, to the NTSO Rule, they are not inconsis-
tent with the Commission's decision to retain the national 
ownership cap.

 2. Failure to comply with s 202(h)
 
 The networks argue that the Commission's decision to 
retain the NTSO Rule was not only arbitrary and capricious 
but also contrary to s 202(h). As just discussed, we agree 
with the networks that two of the reasons the Commission 
gave for retaining the Rule did not even purport to show the 
Rule was necessary in the public interest, as required by the 
statute. Furthermore, we agree that the Commission "pro-
vided no analysis of the state of competition in the television 
industry to justify its decision to retain the national owner-
ship cap." The Commission's brief description of the broad-
casting market, a single paragraph of the 1998 Report under 
the heading "Status of Media Marketplace," is woefully inade-
quate: The Commission merely listed the number of televi-
sion households, the number of television stations, the per-
centage of those stations that are affiliated with networks, 
and the number of stations an average viewer can receive, 
without defining the relevant markets, let alone assessing the 
state of competition therein. See 1998 Report p 9. Nor did 
the Commission attempt to link the listed facts to its decision 
to retain the national ownership cap. That, however, is 
precisely what s 202(h) requires. Consequently, we agree 
with the networks that the Commission "failed even to ad-
dress meaningfully the question that Congress required it to 
answer."

 3. Failure to address the 1984 Report
 
 The Commission's failure to address its 1984 Report in the 
course of its contrary 1998 Report is yet another way in which 
the decision to retain the NTSO Rule was arbitrary and 
capricious. Recall that in the 1984 Report the Commission 
concluded the NTSO Rule should be repealed because it 
focuses upon national rather than local markets and because 
even then any need for the Rule had been undermined by 
competition. 1984 Report p 108. Indeed, even when the 
Commission subsequently reconsidered its decision to elimi-

nate the national ownership cap -- as necessitated by the 
moratorium the Congress imposed upon implementing the 
1984 Report -- it expressly re-affirmed the conclusions 
reached in the Report. Amendment of Multiple Ownership 
Rules, Mem. Op. & Order, 100 F.C.C.2d 74, p 3 (1984). To 
retain the cap in 1998 without explanation of the change in 
the Commission's view is, therefore, to all appearances, sim-
ply arbitrary. The Commission may, of course, change its 
mind, but it must explain why it is reasonable to do so. See 
Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. 
Co., 463 U.S. 29, 57 (1983) ("An agency's view of what is in 
the public interest may change, either with or without a 
change in circumstances. But an agency changing its course 
must supply a reasoned analysis."); Telecomm. Research and 
Action Ctr. v. FCC, 801 F.2d 501, 518 (D.C. Cir. 1986).

 The Commission now argues that the refusal of the Con-
gress to allow the agency to implement the 1984 Report and 
its decision in the 1996 Act to retain an ownership cap 
rendered irrelevant the views the Commission expressed in 
the 1984 Report. When the Congress in 1996 directed the 
Commission periodically to review the ownership cap, howev-
er, it did nothing to preclude the Commission from consider-
ing certain arguments in favor of repealing the cap -- includ-
ing the arguments the Commission had embraced in 1984. 
So long as the reasoning of the 1984 Report stands unrebut-
ted, the Commission has not fulfilled its obligation, upon 
changing its mind, to give a reasoned account of its decision.

 In sum, we hold that the decision to retain the NTSO Rule 
was both arbitrary and capricious and contrary to s 202(h) of 
the 1996 Act. The networks argue that this requires us to 
vacate the Rule rather than merely to remand the case to the 
agency for further consideration. As will be discussed below, 
we disagree, and for this reason we must go on to consider 
the networks' first amendment challenge to the NTSO Rule 
which, if successful, without question would require that the 
Rule be vacated.

B. The First Amendment

 The networks contend that the NTSO Rule violates the 
First Amendment because it prevents them from speaking 

directly -- that is, through stations they own and operate -- 
to 65% of the potential television audience in the United 
States. They would have the court subject the Rule to 
"intermediate scrutiny," rather than to rationality review, on 
the grounds that: (a) in today's populous media marketplace 
the "scarcity" rationale associated with Red Lion Broadcast-
ing Co. v. FCC, 395 U.S. 367 (1969) -- but in fact, we note, 
first set forth in National Broadcasting Co. v. United States, 
319 U.S. 190, 226-27 (1943) (NBC) -- "makes no sense" as a 
reason for regulating ownership; (b) even if scarcity is still a 
valid concern, the NTSO Rule, which does not prevent an 
entity from owning more than one station in the same local 
market, does nothing to mitigate the effect of scarcity; and 
(c) FCC v. League of Women Voters, 468 U.S. 364 (1984), 
which postdates Red Lion, mandates heightened scrutiny for 
all restrictions on broadcast speech. In the alternative, the 
networks argue that even if the NTSO Rule is subject only to 
review for mere rationality -- the least demanding type of 
first amendment scrutiny -- then it is still unconstitutional 
because it "severely restricts [their] free speech rights and 
fails to advance any countervailing public interest."

 The Commission urges the court to accord the NTSO Rule 
more deference than is accorded under intermediate scrutiny 
on the ground that the Supreme Court upheld similar owner-
ship rules in NCCB and NBC upon determining they were 
merely reasonable. Just so.

 In NCCB the court upheld the newspaper/broadcast cross-
ownership rule stating: "The regulations are a reasonable 
means of promoting the public interest in diversified mass 
communications; thus they do not violate the First Amend-
ment rights of those who will be denied broadcast licenses 
pursuant to them." 436 U.S. at 802. In NBC the court 
upheld a regulation that prohibited a network from owning 
more than one radio station in a market and from owning any 
station in a market with few stations. 319 U.S. at 206-08. 
As in NCCB, the Court in NBC held the regulation to be 
consistent with the First Amendment because it was based 
upon network practices deemed contrary to the public inter-

est and not upon the applicants' "political, economic or social 
views, or upon any other capricious basis." Id. at 226-27.

 The networks offer no convincing reason those cases should 
not control. First, contrary to the implication of the net-
works' argument, this court is not in a position to reject the 
scarcity rationale even if we agree that it no longer makes 
sense. The Supreme Court has already heard the empirical 
case against that rationale and still "declined to question its 
continuing validity." Turner I, 512 U.S. 622, 638 (1994). In 
any event, it is not the province of this court to determine 
when a prior decision of the Supreme Court has outlived its 
usefulness. Agostini v. Felton, 521 U.S. 203, 237 (1997).

 Second, contrary to the networks' express protestations, 
the scarcity rationale is implicated in this case. The scarcity 
rationale is based upon the limited physical capacity of the 
broadcast spectrum, which limited capacity means that "there 
are more would-be broadcasters than frequencies available." 
Turner I, 512 U.S. at 637. In the face of this limitation, the 
national ownership cap increases the number of different 
voices heard in the nation (albeit not the number heard in any 
one market). But for the scarcity rationale, that increase 
would be of no moment.

 Third, we do not think League of Women Voters mandates 
heightened scrutiny in this case. That case involved a prohi-
bition upon editorializing by noncommercial broadcasters that 
received government money under the Public Broadcasting 
Act, which prohibition the Court concluded was a content-
based restriction upon speech. 468 U.S. at 383-84. The 
Court applied heightened scrutiny, noting that restrictions 
placed upon broadcasters in order to "secure the public's 
First Amendment interest in receiving a balanced presenta-
tion of views on diverse matters of public concern," such as 
the fairness doctrine at issue in Red Lion, 395 U.S. at 386, 
"have been upheld only when we were satisfied that the 
restriction is narrowly tailored to further a substantial gov-
ernment interest." 468 U.S. at 380. The Court did not 
question, however, the continued propriety of deferential 
scrutiny of structural regulations. Id. The NTSO Rule, 

unlike the ban upon editorializing at issue in League of 
Women Voters, is not a content-based regulation; it is a 
regulation of industry structure, like the newspaper/broadcast 
cross-ownership rule the Court concluded was content-neutral 
in NCCB, and like the network ownership restriction upheld 
in NBC. See NCCB, 436 U.S. at 801; NBC, 319 U.S. at 226-
27. For these reasons, the deferential review undertaken by 
the Supreme Court in NCCB and NBC is also appropriate 
here.

 The networks, drawing directly upon the Commission's 
1984 Report, argue that the Rule fails even rationality review 
because "[p]ermitting one entity to own many stations can 
foster ... more programming preferred by consumers." 
They also suggest that but for the Rule "buyers with superior 
skills [could] purchase stations where they may be able to do 
a better job" of meeting local needs even as they realize 
economies of scale.

 This paean to the undoubted virtues of a free market in 
television stations is not, however, responsive to the question 
whether the Congress could reasonably determine that a 
more diversified ownership of television stations would likely 
lead to the presentation of more diverse points of view. By 
limiting the number of stations each network (or other entity) 
may own, the NTSO Rule ensures that there are more 
owners than there would otherwise be. An industry with a 
larger number of owners may well be less efficient than a 
more concentrated industry. Both consumer satisfaction and 
potential operating cost savings may be sacrificed as a result 
of the Rule. But that is not to say the Rule is unreasonable 
because the Congress may, in the regulation of broadcasting, 
constitutionally pursue values other than efficiency -- includ-
ing in particular diversity in programming, for which diversi-
ty of ownership is perhaps an aspirational but surely not an 
irrational proxy. Simply put, it is not unreasonable -- and 
therefore not unconstitutional -- for the Congress to prefer 
having in the aggregate more voices heard, each in roughly 
one-third of the nation, even if the number of voices heard in 
any given market remains the same.

C. Remedy

 We have concluded that, although the NTSO Rule is not 
unconstitutional, the Commission's decision to retain it was 
arbitrary and capricious and contrary to law because the 
Commission failed to give an adequate reason for its decision, 
failed to comply with s 202(h), and failed to explain its 
departure from its previously expressed views. Now we must 
determine the appropriate remedy.

 The networks ask us to vacate the Rule, relying upon this 
court's opinion in Radio-Television News Directors Ass'n v. 
FCC, 229 F.3d 269 (2000) (RTDNA II). See also RTNDA I, 
184 F.3d 872, 888 n.21 (D.C. Cir. 1999) (holding open possibili-
ty court could vacate political editorial and personal attack 
rules after deciding Commission, which had proposed to 
repeal them, had inadequately justified decision not to do so). 
The Commission, supported by the intervenors, argue that 
the petitioners are entitled only to an order requiring the 
Commission to "conduct a rule making proceeding, which 
might or might no[t] result in repeal of the rules...."

 Under the APA reviewing courts generally limit themselves 
to remanding for further consideration an agency order want-
ing an explanation adequate to sustain it. Thus, when an 
agency arbitrarily and capriciously denies a petition for rule-
making the proper remedy is typically to remand the case for 
reconsideration. See, e.g., Geller v. FCC, 610 F.2d 973, 980 
(D.C. Cir. 1979) (vacating denial of petition for rulemaking to 
repeal cable television rules and remanding for reconsidera-
tion). The case upon which the networks rely involved 
extraordinary circumstances -- extreme delay and non-
responsiveness by the Commission -- that ultimately caused 
the court to issue a writ of mandamus. RTDNA II, 229 F.3d 
at 272; see also Am. Horse Prot. Ass'n, Inc. v. Lyng, 812 
F.2d 1, 7 (D.C. Cir. 1987) (explaining that remand with 
instructions to institute rulemaking is appropriate "only in 
the rarest and most compelling of circumstances"). In the 
present case, however, the agency appears to have been more 
errant than recalcitrant. At the same time, the Commission's 
argument that the court should limit itself to setting aside the 

decision found to be deficient overlooks the relevance of 
s 202(h).

 Although a decision under s 202(h) to retain a rule is 
similar to an agency's denial of a petition for rulemaking, the 
underlying procedures differ in at least one important respect 
that requires a different approach upon judicial review: Sec-
tion 202(h) carries with it a presumption in favor of repealing 
or modifying the ownership rules. Under s 202(h) the Com-
mission may retain a rule only if it reasonably determines 
that the rule is "necessary in the public interest." If the 
reviewing court lacked the power to require the Commission 
to vacate a rule it had improperly retained and could require 
the Commission only to reconsider its decision, then the 
presumption in s 202(h) would lose much of its bite. It is not 
surprising, therefore, that counsel for the Commission con-
ceded at oral argument that the court has the power to 
vacate -- technically, to order the Commission to vacate -- 
the ownership rules. For this reason, we conclude that 
vacatur is one remedy available to redress a violation of 
s 202(h).

 At the same time, it is clear that s 202(h) should not be 
read to require the court always to vacate a rule improperly 
retained by the Commission. After all, vacatur is not neces-
sarily indicated even if an agency acts arbitrarily and capri-
ciously in promulgating a rule. United States Telecom Ass'n 
v. FBI, 2002 WL 63087, *7 (D.C. Cir. 2002); Ill. Pub. Tele-
comm. Ass'n v. FCC, 123 F.3d 693, 693 (D.C. Cir. 1997). The 
question is one of degree; as we said in Allied-Signal, Inc. v. 
United States Nuclear Regulatory Comm'n, 988 F.2d 146 
(D.C. Cir. 1993): "The decision whether to vacate depends on 
the seriousness of the order's deficiencies (and thus the 
extent of doubt whether the agency chose correctly) and the 
disruptive consequences of an interim change that may itself 
be changed." Id. at 150-51. Although here we are reviewing 
an order declining to institute a rulemaking rather than an 
order promulgating a rule, we think the Allied-Signal test 
remains appropriate. Indeed, the situation at hand is proce-
durally similar to that we faced in RTNDA I, where we 
applied the Allied-Signal test. 184 F.3d at 887-89.

 Applying that test we conclude the NTSO Rule should not 
be vacated. Although the Commission's decision to retain the 
Rule was, as written, arbitrary and capricious and contrary to 
s 202(h), we cannot say with confidence that the Rule is likely 
irredeemable because the Commission failed to set forth the 
reasons -- either analytical or empirical -- for which it no 
longer adheres to the conclusions in its 1984 Report. We do 
not infer from this silence that the agency cannot justify its 
change of position, for the Commission apparently labored 
under the misapprehension of law that the Congress, by 
blocking implementation of the 1984 Report, had relieved the 
Commission from further concern with the analysis therein. 
If the Commission rested its decision upon the erroneous 
premise that the Congress had made its 1984 Report irrele-
vant, then having been disabused the Commission may yet 
conclude the Rule is necessary to promote diversity at the 
local or the national level. To reach these conclusions, of 
course, the Commission would have to state the reason(s) for 
which it believes its contrary views set out in the 1984 Report 
were incorrect or are inapplicable in the light of changed 
circumstances, but that is by no means inconceivable; the 
Report is, after all, now almost 20 years old. For this reason 
alone, a remand rather than vacatur is indicated. Moreover, 
we note that although the Commission, in its 1998 Report, 
failed to develop any affirmative justification for the Rule 
based upon competitive concerns, it did, albeit somewhat 
cryptically, advert to possible competitive problems in the 
national markets for advertising and program production, 
1998 Report p 26 n.78; and intervenors NAB and NASA 
make a plausible argument that the NTSO Rule indeed 
furthers competition in the national television advertising 
market. The Commission needs either to develop or to 
jettison these points on remand. In sum, we cannot say it is 
unlikely the Commission will be able to justify a future 
decision to retain the Rule.

 In these circumstances, the other factor to be considered 
under Allied Signal -- the disruption that might be caused if 
the court were now to vacate the Rule and the agency were 
later to re-promulgate it with an adequate explanation -- is 

only barely relevant. It does not appear to us that there 
would be a significant disruption of the agency's regulatory 
program -- contrast Allied-Signal, 988 F.2d at 151, where 
the agency would have had to pay refunds and could not have 
regulated retroactively -- because the Commission presum-
ably could require an entity to divest any station it acquired, 
at peril of being in violation of a newly promulgated owner-
ship cap. Cf. NCCB, 436 U.S. at 802 (upholding Commis-
sion's decision, upon promulgation of newspaper/broadcast 
cross-ownership rule, to require divestiture in some markets 
where ownership concentration was particularly high). At 
the same time, if the Commission is right about the NTSO 
Rule, vacating it would for a time deprive some viewers of 
some diversity in the points of view available on the airwaves. 
See Davis County Solid Waste Mgm't v. EPA, 108 F.3d 1454, 
1458-59 (D.C. Cir. 1997) (considering harm to environment 
that vacatur of emissions standards would impose). In the 
end, it appears that vacatur could cause some but not a great 
loss to the viewing public.

 Upon consideration of both the Allied-Signal factors, we 
conclude that, though the disruptive consequences of vacatur 
might not be great, the probability that the Commission will 
be able to justify retaining the NTSO Rule is sufficiently high 
that vacatur of the Rule is not appropriate. See United 
States Telecom Ass'n, 2002 WL 63087 at *7 (focusing upon 
first factor of Allied-Signal test). We therefore remand this 
case to the Commission for further consideration whether to 
repeal or to modify the NTSO Rule.

 IV. The CBCO Rule

 Time Warner's principal contention is that the CBCO Rule 
is an unconstitutional abridgment of its first amendment right 
to speak. Time Warner also argues that the Commission's 
decision to retain the Rule was arbitrary and capricious and 
contrary to s 202(h). Because we agree that the retention 
decision was arbitrary and capricious as well as contrary to 
s 202(h), and that this requires us to vacate the Rule, we do 
not reach Time Warner's first amendment claim.

A. Section 202(h) and the APA

 Time Warner raises a host of objections to the Commis-
sion's decision to retain the CBCO Rule. The Commission is 
largely unresponsive to these arguments; to the extent it is 
responsive, it is unpersuasive.

 First, Time Warner argues that the Commission impermis-
sibly justified retaining the Rule on a ground, namely that 
cable/broadcast combines might "discriminate against unaffili-
ated broadcasters in making cable-carriage decisions," differ-
ent from the one it gave when it promulgated the Rule, 
namely, that "cable should be protected" from acquisition by 
networks bent upon pre-empting new competition. The Com-
mission does not respond but even so we think the argument 
is clearly without merit. Nothing in s 202(h) suggests the 
grounds upon which the Commission may conclude that a rule 
is necessary in the public interest are limited to the grounds 
upon which it adopted the rule in the first place.

 Next, Time Warner argues that the Commission applied 
too lenient a standard when it concluded only that the CBCO 
Rule "continues to serve the public interest," 1998 Report 
p 102, and not that it was "necessary" in the public interest. 
Again the Commission is silent, but this time we agree with 
Time Warner; the Commission appears to have applied too 
low a standard. The statute is clear that a regulation should 
be retained only insofar as it is necessary in, not merely 
consonant with, the public interest.

 Finally, Time Warner attacks the specific reasons the 
Commission gave for retaining the Rule. All three reasons 
relate either to competition or to diversity, and we have 
grouped them below accordingly.

 1. Competition
 
 The Commission expressed concern that a cable operator 
that owns a broadcast station: (1) can "discriminate" against 
other broadcasters by offering cable/broadcast joint advertis-
ing sales and promotions; and (2) has an incentive not to 
carry, or to carry on undesirable channels, the broadcast 
signals -- including the forthcoming digital signals -- of 

competing stations. 1998 Report p p 103-105. Addressing 
the first concern, Time Warner argues that the Commission 
failed both to explain why joint advertising rates constitute 
"discrimination -- which is simply a pejorative way of refer-
ring to economies of scale and scope" -- and to "point to 
substantial evidence that such 'discrimination' is a non-
conjectural problem." Addressing the second concern (in 
part), Time Warner contends that refusals by cable operators 
to carry digital signals must not be a significant problem 
because the Commission has declined to impose must-carry 
rules for duplicate digital signals. See Carriage of Digital 
Television Broadcast Signals, First Report & Order and 
Further Notice of Proposed Rulemaking, 16 F.C.C.R. 2598 
(2001). Both of Time Warner's points are plausible -- indeed 
the first is quite persuasive -- and we have no basis upon 
which to reject either inasmuch as the Commission does not 
respond to them.

 Next, Time Warner gives four reasons for which the Com-
mission's concern about discriminatory carriage of broadcast 
signals is unwarranted. First, must-carry provisions, see 47 
U.S.C. ss 534-535; 47 C.F.R. s 76.55 et seq., already ensure 
that broadcast stations have access to cable systems; indeed, 
the Commission pointed to only one instance in which a cable 
operator denied carriage to a broadcast station (Univision). 
See 1998 Report p 104. Second, competition from direct 
broadcast satellite (DBS) providers makes discrimination 
against competing stations unprofitable. Third, the Commis-
sion failed to explain why it departed from the position it took 
in the 1992 Report, where it said that the CBCO Rule was not 
necessary to prevent carriage discrimination. Fourth, be-
cause a cable operator may lawfully be co-owned with a cable 
programmer or a network, the Rule does little to cure the 
alleged problem of cable operators having an incentive to 
discriminate against stations that air competing program-
ming.

 In response the Commission concedes it did not address 
Time Warner's second and third points -- competition from 
DBS services and the contradiction of the 1992 Report: 
"Since the Commission did not address any of these issues in 
the 1998 Report, counsel for the Commission are not in a 

position to respond to Time Warner's claims concerning these 
issues." The same might have been said of Time Warner's 
fourth point. These failings alone require that we reverse as 
arbitrary and capricious the Commission's decision to retain 
the CBCO Rule. See Motor Vehicles Mfrs. Ass'n v. State 
Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (a decision is 
arbitrary and capricious if the agency fails "to consider an 
important aspect of the problem").

 The only argument to which the Commission does respond 
is that the Univision incident alone cannot justify retention of 
the Rule: The Commission first points to its predictive 
judgment that there would be more discrimination without 
the CBCO Rule and then, citing Time Warner I, 211 F.3d at 
1322-23, points out that the availability of behavioral reme-
dies does not necessarily preclude it from imposing a struc-
tural remedy. We acknowledge that the court should ordi-
narily defer to the Commission's predictive judgments, and 
we take the Commission's point about remedies. In this case, 
however, the Commission has not shown a substantial enough 
probability of discrimination to deem reasonable a prophylac-
tic rule as broad as the cross-ownership ban, especially in 
light of the already extant conduct rules. A single incident 
since the must-carry rules were promulgated -- and one that 
seems to have been dealt with adequately under those 
rules -- is just not enough to suggest an otherwise significant 
problem held in check only by the CBCO Rule.

 We conclude that the Commission has failed to justify its 
retention of the CBCO Rule as necessary to safeguard com-
petition. The Commission failed to consider competition from 
DBS, to justify its change in position from the 1992 Report, 
and to put forward any adequate reason for believing the 
Rule remains "necessary in the public interest."

 2. Diversity
 
 As for retaining the Rule in the interest of diversity, the 
Commission had this to say: "Cable/TV combinations ... 
would represent the consolidation of the only participants in 
the video market for local news and public affairs program-
ming, and would therefore compromise diversity." 1998 Re-

port p 107. Time Warner argues that this rationale is con-
trary to s 202(h), as well as arbitrary and capricious, for 
essentially three reasons.

 First, Time Warner contends that s 202(h), by virtue of its 
exclusive concern with competition, plainly precludes consid-
eration of diversity and that, in any event, it should be so 
interpreted in order to avoid the constitutional question 
raised by the burden the CBCO Rule places upon the compa-
ny's right to speak. Second, Time Warner argues that the 
increase in the number of broadcast stations in each local 
market since the promulgation of the CBCO Rule in 1970 
renders any marginal increase in diversity owing to the 
operation of the Rule too slight to justify retaining it. Final-
ly, Time Warner asserts that the decision to retain the Rule 
cannot be reconciled with the TV Ownership Order, in which 
the Commission concluded that a single entity may own two 
local television stations as long as there are eight other 
stations in the market and one of the two stations coming 
under common ownership is not among the four most watched 
stations. See Review of the Commission's Regulations Gov-
erning Television Broadcasting, Report & Order, 14 F.C.C.R. 
12903, p 64 (1999).

 The Commission responds feebly. First, it does not ad-
dress Time Warner's argument that diversity may not be 
considered under s 202(h), but that is of little moment be-
cause it adequately addressed essentially the same argument 
when it was presented by the networks in connection with the 
NTSO Rule: A rule may be retained if it is necessary "in the 
public interest"; it need not be necessary specifically to 
safeguard competition. Second, the Commission concedes 
that it decided to retain the Rule without considering the 
increase in the number of competing television stations since 
it had promulgated the Rule in 1970. The Commission gives 
no explanation for this omission, yet it is hard to imagine 
anything more relevant to the question whether the Rule is 
still necessary to further diversity.

 Finally, the Commission makes no response to Time War-
ner's argument that the concern with diversity cannot support 

an across-the-board prohibition of cross-ownership in light of 
the Commission's conclusion in the TV Ownership Order that 
common ownership of two broadcast stations in the same local 
market need not unduly compromise diversity. The Commis-
sion does object that Time Warner failed to raise this argu-
ment before the agency, but it appears that Time Warner did 
what it could to bring the argument to the Commission's 
attention. The TV Ownership Order was issued in August, 
1999, after the close of the comment period, but almost a year 
before the 1998 Report was issued (in June, 2000). A few 
months thereafter Time Warner proffered supplemental com-
ments raising this point but the Commission declined to 
consider them. 1998 Report p 100 n.257. For this reason, we 
find the Commission's forfeiture argument unpersuasive. 
Even if it was proper for the agency to refuse to accept the 
comments, however, it does not follow that the agency was 
free to ignore its own recently issued TV Ownership Order. 
Yet the Commission made no attempt in the 1998 Report and 
makes no attempt in its brief to harmonize its seemingly 
inconsistent decisions.

 In sum, the Commission concedes it failed to consider the 
increased number of television stations now in operation, and 
it is clear that the Commission failed to reconcile the decision 
under review with the TV Ownership Order it had issued only 
shortly before. We conclude, therefore, that the Commis-
sion's diversity rationale for retaining the CBCO Rule is 
woefully inadequate.

 B. Remedy
 
 The only question left is whether, as Time Warner re-
quests, we should order the Commission to vacate the CBCO 
Rule itself -- as opposed merely to reversing the Commis-
sion's decision not to initiate a proceeding to repeal the Rule 
and remanding the matter for further consideration by the 
agency. Again, this type of decision is governed by the test 
laid out in Allied-Signal. As discussed above, the Commis-
sion put forward justifications for retaining the NTSO 
Rule -- furthering local diversity by strengthening the bar-
gaining position of network affiliates and furthering national 

diversity -- that we rejected principally because the Commis-
sion failed to address the contrary position it took in its 1984 
Report. We noted, however, that the Commission's failure to 
explain why it departed from the views it expressed in 1984 
appears to have stemmed from an error of law and not 
necessarily from an inability to do so. In addition, the 
intervenors presented plausible reasons for thinking the 
NTSO Rule may be necessary to further competition. The 
same cannot be said with respect to the CBCO Rule. The 
Commission gave no reason to think it could adequately 
address its conclusions in the 1992 Report or in the TV 
Ownership Order. Rather, the Commission simply failed to 
respond to the objections put before it. Furthermore, neither 
the Commission nor the intervenors gave any plausible rea-
son for believing the CBCO Rule is necessary to further 
competition. Although the Commission presumably made its 
best effort, the reasons it gave in the 1998 Report for 
retaining the CBCO Rule were at best flimsy, and its half-
hearted attempt to defend its decision in this court is but 
another indication that the CBCO Rule is a hopeless cause.

 Nor does it appear that vacating the CBCO Rule will be 
disruptive of the agency's regulatory program. If the agency 
wants to re-promulgate the Rule and is able to justify doing 
so, it presumably can require any entity then in violation of 
the Rule to divest either its broadcast station or its cable 
system in any market where it owns both. Cf. NCCB, 436 
U.S. at 802. Although viewers may, in the interim, experi-
ence some diminution of diversity, the loss would seemingly 
be no greater than the diminution attendant upon the combi-
nation of two broadcast stations in the same market, which 
combination the Commission recently sanctioned in the TV 
Ownership Order. In sum, vacating the Rule might cause 
some disruption, but we hardly think it could be substantial.

 Because the probability that the Commission would be able 
to justify retaining the CBCO Rule is low and the disruption 
that vacatur will create is relatively insubstantial, we shall 
vacate the CBCO Rule.

 V. Conclusion

 The decision of the Commission not to repeal or to modify 
the NTSO Rule is vacated and the question whether to retain 
the Rule is remanded to the Commission for further proceed-
ings consistent with this opinion. This court's stay order of 
April 6, 2001 is vacated without prejudice to the petitioners' 
ability to seek a further stay from the Commission during the 
pendency of such proceedings. The decision of the Commis-
sion not to repeal or to modify the CBCO Rule is also 
vacated, and the Commission is directed to repeal the CBCO 
Rule forthwith.

 So ordered.