988 F.2d 146
 Nuclear Reg. Rep. P 20,561, 300 U.S.App.D.C. 198
 ALLIED-SIGNAL, INC., Petitioner,
v.
U.S. NUCLEAR REGULATORY COMMISSION and the United States of
America, Respondents,
COMBUSTION ENGINEERING, INC., Petitioner,
v.
U.S. NUCLEAR REGULATORY COMMISSION and the UNITED STATES
of America, Respondents,
COMBUSTION ENGINEERING, INC., Petitioner,
v.
U.S. NUCLEAR REGULATORY COMMISSION and the United States
of America, Respondents,
ALLIED-SIGNAL, INC., Petitioner,
v.
U.S. NUCLEAR REGULATORY COMMISSION, Respondent.
 Nos. 91-1407, 91-1435, 92-1001, 92-1019.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 5, 1992.
Decided March 16, 1993.
 
 Petitions for Review of An Order of the U.S. Nuclear Regulatory Commission.
 John Hoff, with whom Leonard A. Miller, Washington, DC, was on the brief, for petitioner Allied Signal, Inc. in Nos. 91-1407 and 92-1019.
 Harold F. Reis, with whom Michael F. Healy, Washington, DC, was on the brief, for petitioner Combustion Engineering, Inc. in Nos. 91-1435 and 92-1001.
 L. Michael Rafky, with whom William C. Parler, General Counsel, John F. Cordes, Sr., Sol., and E. Leo Slaggie, Deputy Sol., U.S. Nuclear Regulatory Com'n, Rockville, MD, and Katherine Adams, Atty., Dept. of Justice, Washington, DC, were on the brief, for respondents.
 Before: SILBERMAN, WILLIAMS and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Congress has directed the Nuclear Regulatory Commission to recover 100% of its costs from those who receive its regulatory "services" and to allocate the costs "fairly and equitably" among those recipients. Petitioners Allied Signal and Combustion Engineering challenge an NRC rule making that allocation; they also attack the NRC's denial of various requested exemptions from the fees. They allege that the Commission's actions did not satisfy Congress's "fair[ ] and equitabl[e]" standard and also were arbitrary and capricious. We agree in part and remand the case to the Commission.
 
 
 2
 Under authority granted in the Independent Offices Appropriation Act of 1952 ("IOAA"), 31 U.S.C. § 9701, the Commission has long charged fees to any person who received a "service or thing of value" from the Commission. (That term includes, perhaps oxymoronically, "regulatory services" such as permit processing.) In 1986, Congress expanded the NRC's recovery authority in the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub.L. No. 99-272, 100 Stat. 82, 147, and authorized it to recover 33% of its total annual budget through fees. Because IOAA fees could not generate that sum, Congress allowed the NRC to assess fees not only for the service-specific costs covered by IOAA but also for the Commission's generic costs of operation (e.g., costs associated with rulemaking proceedings or safety research). Later acts raised the budget recovery level to 45% for the years 1988 through 1990.[1] In carrying out the 33% and 45% recovery mandates, the Commission imposed fees for generic costs only on licensees who operated nuclear power reactors, reasoning that they absorbed the most regulatory resources. See Florida Power and Light Co. v. United States, 846 F.2d 765 (D.C.Cir.1988).
 
 
 3
 In the 1990 Omnibus Reconciliation Act ("1990 OBRA"), Pub.L. No. 101-508, 104 Stat. 1388-299, Congress raised the recovery mandate for 1991-95 to 100% of the Commission's budget, see Pub.L. No. 101-508, § 6101 (codified at 42 U.S.C. § 2214), and told the Commission to promulgate a rule apportioning the generic fees "fairly and equitably" among licensees. Id. at § 6101(c)(3) (codified at 42 U.S.C. § 2214(c)(3)). The legislation further said that "[t]o the maximum extent practicable, the charges [assessed by the rule] shall have a reasonable relationship to the cost of providing regulatory services and may be based on the allocation of the Commission's resources among licensees or classes of licensees." Id. After notice and comment, the Commission issued a rule purporting to carry out these directions. In doing so, it imposed fees on virtually all licensees. See Revision of Fee Schedules; 100% Fee Recovery (the "Final Rule"), 56 Fed.Reg. 31,472 (July 10, 1991) (codified at 10 CFR §§ 52, 71, 170, and 171).I
 
 
 4
 Allied, a uranium hexafluoride (UF sub6 ) converter, first complains about the Commission's failure to consider the inability of UF sub6 converters to "pass through" OBRA fees to customers--i.e., to recoup them in whole or in part by raising prices. Allied asserts that the Commission's treatment of the issue was inconsistent with OBRA and also with the NRC's treatment of other licensees' passthrough capability.
 
 
 5
 Allied's claim rests on simple facts. It explains that domestic UF sub6 converters compete with foreign UF sub6 converters who are not subject to NRC licensing and thus are not required to pay NRC fees. Competition, it says, is stiff; success in bidding on UF sub6 conversion contracts often turns on differentials as small as one cent per pound. Fees imposed under the Final Rule, however, add up to almost five cents per pound of UF sub6 . Because adding the fee to their prices will drive customers to foreign converters, domestic UF sub6 converters cannot pass the costs forward. Allied draws a sharp contrast between UF sub6 converters and other NRC licensees such as electric utilities, which it says are readily able to pass the costs on to customers. The Commission disputes none of these assertions.
 
 
 6
 Allied's statutory theory rests both on the 1990 OBRA and on the legislative history of 1986 COBRA--the latter being explicitly linked to the 1990 OBRA via its legislative history. Section 6101(c)(3) of the 1990 OBRA (codified at 42 U.S.C. § 2214(c)(3)), provides that
 
 
 7
 [t]he Commission shall establish, by rule, a schedule of charges fairly and equitably allocating the aggregate amount of charges ... [necessary to recoup 100% of the Commission's budget].
 
 
 8
 (Emphasis added.) The Conference Report to the 1990 OBRA states that the Commission has "the discretion ... to assess annual charges against all of its licensees." H.R. Conf. Rep. No. 964, 101st Cong., 2d Sess. (1990), at 961, U.S.Code Cong. & Admin.News 1990 at 2017, 2666. At the same time, however, the Report expressly "reaffirm[s] the statement of the [floor] managers [of 1986 COBRA] on the present authority" of the NRC to assess fees. Id. That statement in turn declared that it was the "intention of the conferees that, because certain Commission licensees, such as universities, hospitals, research and medical institutions, and uranium producers have limited ability to pass through the costs of these charges to the ultimate consumer, the Commission should take this factor into account in determining whether to modify [its] current fee schedule for such licensees." 132 Cong. Rec. H3797/3 (March 6, 1986) (emphases added).
 
 
 9
 The statutory language and legislative history do not, in our view, add up to an inexorable mandate to protect classes of licensees with limited ability to pass fees forward. Even the 1986 legislative history, written in the context of COBRA's less-demanding 33% recovery mandate, only directed the Commission to "take ... account" of passthrough considerations, which would not necessarily entail that those considerations control. Moreover, the 1990 Conference Report explicitly said that Congress preserved NRC's discretion to impose fees on "one or more classes of non-power-reactor licensees if the Commission believes it can fairly, equitably, and practicably do so." H.R. Conf. Rep. No. 964, 101st Cong., 2d Sess. (1990), at 961, U.S.Code Cong. & Admin.News 1990 at 2666. Even if we were to give the legislative history great weight, we could not conclude that Congress has "directly spoken" to whether the Commission must spare licensees that cannot pass the fees forward. See Chevron v. Natural Resources Defense Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The question therefore is whether the Commission's interpretation is reasonable. See Id. at 845, 104 S.Ct. at 2783; Chemical Manufacturers Ass'n v. EPA, 919 F.2d 158, 162-63 (D.C.Cir.1990).
 
 
 10
 The Commission offered two justifications for its decision to disregard the passthrough concerns of UF sub6 converters. First, it argued that it could not adjust fees based on competitive impact because the 100% recovery mandate of 1990 OBRA would require any abatement of fees for one class of licensees to be recouped from others. See Final Rule, 56 Fed.Reg. at 31,476; Letter of NRC Denying Allied Exemption Request at 3-4. However, while one could argue that it is unfair to charge any regulatee more than its pro rata share of generic costs (and not unfair to excuse some regulatees from paying all of their pro rata share when less than 100 percent must be recovered), that potential explanation does not carry the day here. The Commission's willingness to make an exemption for nonprofit educational institutions belies the assertion that it will not charge any regulatee more than its pro rata share.
 
 
 11
 Nonetheless, the Commission also pointed to an entirely legitimate concern--the difficulty of assessing the ability of its 9000 licensees to pass through costs. See NRC Denial of Allied Exemption Request at 4. A firm's ability to pass through a burden to its customers depends on the price elasticities of supply and demand. "Inelastic suppliers and demanders pay taxes." Donald N. McCloskey, The Applied Theory of Price 324 (1982). (While the fees are technically not taxes, the same principle applies to costs generally.) Because these elasticities are typically hard to discover with much confidence, the Commission's refusal to read the statute as a rigid mandate to do so is not only understandable but reasonable.
 
 
 12
 It does not follow, however, that the Commission's application of the statute was in every respect reasonable. If capacity to pass the fees through can be determined with reasonable accuracy and at reasonable cost for specific classes of licensees, there appears no reason why the Commission should not do so. In fact, the Commission has made such a determination for another class of licensees, even though that class's claim seems no better founded than the claim of the domestic UF sub6 converters.
 
 
 13
 Specifically, in the Final Rule the Commission exempted nonprofit educational institutions from payment of certain 1990 OBRA fees. See 56 Fed.Reg. at 31,487/1-2, 31,491/1-2; 10 CFR § 171.11(a). This appears to be based at least in part on the rationale that such institutions "have a limited ability to pass the[ ] costs on to others." Final Rule, 56 Fed.Reg. at 31,477/1-2 (1991).[2] See also 56 Fed.Reg. at 31,487/2 (speaking of educational institutions' "limited ability to pass regulatory costs through to their clients").
 
 
 14
 The Commission nowhere explains how it was able to make this finding for non-profits but is not able to resolve the elasticity claim one way or the other for domestic UF sub6 converters. The Commission does not so much as hint at data relating to the markets in which educational institutions serve their "clients".[3] Neither does the Commission explain why a demand elasticity calculation was any easier or less costly to complete for educational institutions than for UF sub6 converters. Thus the Commission's denial of relief for UF sub6 converters, both at the rulemaking and the exemption stages, cannot be viewed as reasoned decision-making.
 
 
 15
 An inadequately supported rule, however, need not necessarily be vacated. See, e.g., International Union, UMW v. FMSHA, 920 F.2d 960, 966-67 (D.C.Cir.1990); Maryland People's Counsel v. FERC, 768 F.2d 450, 455 (D.C.Cir.1985); ICORE, Inc. v. FCC, 985 F.2d 1075, 1081 (D.C.Cir.1993). The decision whether to vacate depends on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." International Union, 920 F.2d at 967.
 
 
 16
 It is conceivable that the Commission may be able to explain how the principles supporting an exemption for educational institutions do not justify a similar exemption for domestic UF sub6 converters. For example, the Commission may develop a reasoned explanation based on an alternative justification that it offered for the non-profit educational institutions' exemption--that "educational research provides an important benefit to the nuclear industry and the public at large and should not be discouraged." 56 Fed.Reg. at 31,477/2. While this reference is quite vague--the benefits of UF sub6 conversion can hardly be deprecated merely because the converters operate in a conventional market--perhaps the Commission's focus is on education, with the idea that education yields exceptionally large externalized benefits that cannot be captured in tuition or other market prices. We cannot tell at this point whether the exemption for educational institutions could be reasonably rooted in such a theory, but there is at least a serious possibility that the Commission will be able to substantiate its decision on remand.
 
 
 17
 At the same time, the consequences of vacating may be quite disruptive. Even assuming that we could merely vacate the rule insofar as it denies an exemption for UF sub6 converters, the Commission would need to refund all 1990 OBRA fees collected from those converters; in addition it evidently would be unable to recover those fees under a later-enacted rule. See Bowen v. Georgetown University Hospital, 488 U.S. 204, 208-09, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) (rejecting retroactive application of rules even if operating only to cure defects in previously enacted rule). Therefore, because of the possibility that the Commission may be able to justify the Rule, and the disruptive consequences of vacating, we remand to the Commission for it to develop a reasoned treatment of exemption claims based on passthrough limitations.
 
 
 18
 Combustion Engineering also raised a related passthrough argument--that long-term fixed price contracts in its sector of the industry constrain its ability to pass through costs and therefore require some sort of gradual phase-in. See Comments of Combustion Engineering, May 13, 1991 at 2. On remand, the Commission must address this claim as well.
 
 II
 
 19
 Allied also argues that the Commission's apportionment of fees within the class of domestic UF sub6 converters violated the 1990 OBRA. Allied argues (again without dispute by the Commission) that it has required much less regulatory attention than the only other member of the UF sub6 converter class, the Sequoyah Fuels Corporation, because of the latter's environmental problems. See NRC Denial of Allied Exemption Request at 7. Thus, Allied says, allocation of the fees equally between the two UF sub6 converters violated the 1990 OBRA's directives that OBRA charges be apportioned "fairly and equitably" and that "[t]o the maximum extent practicable, the charges shall have a reasonable relationship to the cost of providing regulatory services." Pub.L. No. 101-508, § 6101(c)(3) (codified at 42 U.S.C. § 2214(c)(3)). Allied contends that the Commission instead ought to have divided the class's fees either in proportion to the amount of NRC attention required by each converter or in proportion to the service-specific (IOAA) fees paid by the two converters.
 
 
 20
 Allied's argument fails because it disregards the premise that 1990 OBRA fees are not service-specific: they do not relate to identifiable services but rather constitute generic costs. See Final Rule, 56 Fed.Reg. at 31,472. Assuming that the Commission correctly classified the costs in question (and Allied does not contest the classification), there is a presumption that even regulatory effort precipitated by the circumstances of a single licensee of a given class will yield results, such as research findings or regulations, of roughly equal importance for all members of the same class.
 
 
 21
 This conclusion is not undermined by the Commission's willingness to apportion 1990 OBRA fees between groups of licensees on the basis of the attention required by each group. See Final Rule, 56 Fed.Reg. at 31,476; Letter of NRC Denying Allied Exemption Request at 2, 4-5. First, the spillover of benefits seems far greater within a group of licensees than between groups. See id. at 5. Second, the administrative costs of group-level apportionment are obviously much lower than licensee-level apportionment because the number of licensees greatly exceeds the number of groups.
 
 
 22
 Here, neither of the measuring devices proposed by Allied was workable or accurate enough to warrant our holding the Commission's rejection of them arbitrary or capricious. Any correlation between a licensee's IOAA (licensee-specific) costs and its benefits from generic costs seems purely coincidental. And to use as a yardstick each member's tendency to precipitate regulatory effort would not only disregard spillover effects but would raise exceptional measurement problems. See NRC Denial of Allied Exemption Request at 4-8.
 
 III
 
 23
 Allied makes a narrower attack on the Commission's rejection of intra-group apportionment, namely that the Commission was arbitrary and capricious in failing to apportion the generic costs associated with the disposal of low level radioactive waste ("LLW") on the basis of each licensee's actual waste. See Final Rule, 56 Fed.Reg. at 31,497; 10 CFR § 171.16(e). At the class level, the Commission allocated costs in accordance with each class's contribution to the total quantity of LLW. Because materials licensees (a group that includes UF sub6 converters) collectively generate 40% of the nation's LLW, the Commission allocated 40% of its LLW costs to that class. See id. When it turned to apportionment of those fees among the materials licensees, however, the Commission abandoned that approach and simply assessed each large fuel facility (of which Allied is one) an identical charge of $143,500. For explanation, the NRC offered only the conclusory statement that "[t]he Commission ... believe[s] ... the surcharge should be the same for all large fuel facility licensees." See Final Rule, 56 Fed.Reg. at 31,481.
 
 
 24
 The Commission provides no rationale for apportioning costs among classes of LLW producers on the basis of LLW output but refusing to apply that same yardstick in apportioning generic costs within classes, and no rationale is readily apparent. While it is conceivable that the real benefit of LLW disposal services is merely the availability of such services--in which case a flat fee would make sense--any such idea is inconsistent with the Commission's method of apportioning LLW fees among classes of licensees, which appears to assume that benefit is proportional to LLW quantity. If, on the other hand, any licensee's benefit from LLW disposal is directly proportional to its LLW disposal, apportioning even generic costs on the basis of output seems to make sense--not only as to classes but also as to individual licensees. Finally, assuming that the Commission calculated each class's quantity of LLW waste from data supplied by each licensee (as seems necessarily true), it is hard to see any administrative problem with apportioning the fees within the class on the basis of output; the data are available and the required computations would be rudimentary.
 
 
 25
 In applying the balancing of International Union and like cases, we here give little weight to the possibility that the Commission could pull a reasonable explanation out of the hat. Nonetheless, vacating the intra-class apportionment of LLW costs would give licensees a peculiar windfall; even ones that benefitted from the Commission's choice would presumably be entitled to a refund, and, under Georgetown University Hospital, the LLW costs could be recovered from no one. To be sure, the costs are not great, absolutely or as a proportion of the Commission's $465 million budget for FY 1991--$3.8 million. See 56 Fed.Reg. at 31,486, 31,497. But that alone is hardly a reason to create such a windfall. Accordingly, we refrain from vacating the rule. If on remand the Commission concludes that the apportionment must be in accordance with usage, then those firms whose burden is lower under a new, non-arbitrary, rule should be entitled to refunds of the difference.
 
 
 26
 If indeed the remand leads to replacement of the per-licensee allocation, and licensees enjoy only refunds for the difference between liability under the old rule and liability under the new (rather than total refunds), it might be argued that such a result allows the new rule to have "retroactive effect", in violation of Georgetown University Hospital. See 488 U.S. at 208, 109 S.Ct. at 471. There is, plainly, some retroactive effect. The effect, however, is only to define that aspect of the old rule that must be cut away as legally excessive. We do not read Georgetown as barring so limited a retroactive impact.
 
 IV
 
 27
 Finally, Combustion Engineering challenges the Commission's decision to allocate OBRA fees equally to each low enriched uranium ("LEU") manufacturing license instead of dividing the fees equally among the LEU manufacturing licensees. Combustion owns and operates two LEU facilities, each separately licensed, and Combustion asserts that in the aggregate the two are operationally equivalent to the single-plant, single-license, facilities of the other LEU manufacturers. At oral argument Combustion explained that it has two licenses for the facilities only because of historical chance; it bought a company with a separate license almost 20 years ago and until the Commission implemented the current OBRA fee schedule there has never been any reason to consolidate the licenses. As before, the Commission disputes none of these contentions.
 
 
 28
 Combustion attacks both the regulation imposing the "equal fee per license" rule and the Commission's denial of an exemption. Both claims rest ultimately on the 1990 OBRA's direction that fees must be apportioned "fairly and equitably" and that "[t]o the maximum extent practicable, ... charges shall have a reasonable relationship to the cost of providing regulatory services." Pub.L. No. 101-508, § 6101(c)(3) (codified at 42 U.S.C. § 2214(c)(3)). Although we find the first claim unconvincing, we agree that the Commission has not justified its refusal to give the requested exemption.
 
 
 29
 The argument that the "equal fee per license" rule is "[un]fair and [in]equitabl[e]" is persuasive only on the ground that the rule produced troubling results when applied to Combustion's circumstances--which Combustion itself asserts are unusual. We see no reason for requiring the Commission to attend to that rather rare situation in the rule itself, cf. NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), especially as the generic rule allowed (generically) for exemption.[4]
 
 
 30
 Combustion's exemption argument, however, has merit. The Commission's own criteria call for an exemption if the licensee can show that "the assessment of the annual fee w[ould] result in a significantly disproportionate allocation of costs to the licensee." 10 CFR § 171.11(d). The double assessment against Combustion's two licenses increased its OBRA fees by $836,500. Against this, the Commission is able to point to almost nothing by way of greater costs. Speaking to the issue in unusually murky, discursive language, the NRC in substance could point to only two additional burdens--the need to mail an extra copy of certain NRC publications to the second facility and the need for two different NRC regional offices to monitor and respond to allegations about the two plants. See NRC Denial of Combustion Exemption Request at 5-6.
 
 
 31
 The double burden for Combustion, measured against de minimis additional burdens for the Commission, amply overcomes the hurdle established by 10 CFR § 171.11(d).[5] Thus the exemption denial is arbitrary and capricious. We therefore direct the Commission to grant an exemption for Combustion on the additional fees collected as a result of the double-licensing of its operation.[6]
 
 
 32
 * * * * * *
 
 
 33
 We remand the case to the Commission for a reasoned and coherent treatment of (1) licensees' claims for special treatment on the basis of inability to pass the burden of the fees through to customers and (2) the method of apportioning generic LLW disposal costs among materials licensees. In addition, we direct the Commission to grant an exemption to Combustion for the generic fees attributable to the double-licensing of its LEU operation.
 
 
 34
 So ordered.
 
 
 
 [1]
 See Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100-203, 101 Stat. 1330, 1330-275; Omnibus Reconciliation Act of 1989, Pub.L. No. 101-239, 103 Stat. 2106, 2132
 
 
 [2]
 This passage relates to the service-specific fees, but no independent justification for the exemption from generic costs appears, and the Commission here seems to assume that the explanation extends to the generic. See Commission Brief at 8, 19-20
 
 
 [3]
 We note that for educational institutions with certain types of licenses, the exemption is unavailable with respect to activities such as "[r]emunerated services ... [performed for] other persons" and "[a]ctivities performed under a Government contract". See 10 CFR § 171.11(a)(2) & (4). This exclusion from the exemption, however, is limited to specific types of licenses, namely "byproduct, source or special nuclear material licenses."
 
 
 [4]
 Insofar as Combustion argues, in parallel with Allied, that § 6101(c)(3) of OBRA generally requires intra-group apportionment on the basis of factors such as the amount of attention a licensee requires, the competitive position of the licensee, and the safety risks posed by the licensee's activities, we reject it for the reasons stated as to Allied
 
 
 [5]
 10 CFR § 171.11(d) also contains two other factors that the Commission shall consider when evaluating an exemption request. Although parts of § 171.11(d) are ambiguous regarding whether an applicant must fulfill all, or only one, of the factors, the fact that an applicant could not "fulfill" the criterion listed in § 171.11(d)(3)--"[a]ny other relevant matter that the licensee believes shows that the annual fee was not based on a fair and equitable allocation of NRC costs"--reveals that the "factors" should not be read as conjunctive requirements. The factors instead seem to be best understood as independent considerations which can support an exemption
 
 
 [6]
 We are not required to address Allied's fee exemption request because of our previous disposition of Allied's other claims. The aspects of Allied's request dealing with passthrough ability and LLW fees are almost certain to stand or fall along with the remanded claims; and the aspect claiming that OBRA requires licensee-specific calibration of fees fails