# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 24, 2009         Decided August 28, 2009

No. 08-1114

COMCAST CORPORATION,
PETITIONER

NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION ET AL.,
INTERVENORS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,
RESPONDENTS

CCTV CENTER FOR MEDIA & DEMOCRACY ET AL.,
INTERVENORS

———

On Petition for Review of an Order
of the Federal Communications Commission

———

*Miguel A. Estrada* argued the cause for petitioner. With him on the briefs were *Theodore B. Olson*, *David Debold*, *Tyler R. Green*, *Helgi C. Walker*, *Eve Klindera Reed*, *Arthur J. Burke*, and *David P. Murray*.

*Mark D. Schneider* argued the cause for intervenors National Cable & Telecommunications Association et al. in support of petitioner. With him on the briefs were *Michelle A. Groman*, *Bruce Douglas Sokler*, *Robert G. Kidwell*, *Howard J. Symons*, *Daniel L. Brenner*, *Neal M. Goldberg*, *Michael S. Schooler*, *Henk J. Brands*, *Wesley R. Heppler*, and *Robert G. Scott, Jr.*

*Michael E. Glover*, *Edward Shakin*, *William H. Johnson*, *Patrick F. Philbin*, and *Gregory L. Skidmore* were on the brief for *amicus curiae* Verizon Communications, Inc. in support of petitioner.

*W. Kenneth Ferree* was on the brief for *amicus curiae* the Progress & Freedom Foundation in support of petitioner.

*James M. Carr*, Counsel, Federal Communications Commission, argued the cause for respondent. With him on the brief were *Deborah A. Garza*, Acting Assistant Attorney General, *Catherine G. O'Sullivan* and *Robert J. Wiggers*, Attorneys, *Matthew B. Berry*, General Counsel, Federal Communications Commission, *Joseph R. Palmore*, Deputy General Counsel, *Richard K. Welch*, Deputy Associate General Counsel, and *Joel Marcus*, Counsel. *Daniel M. Armstrong*, Associate General Counsel, entered an appearance.

*Andrew J. Schwartzman* argued the cause for intervenors CCTV Center for Media & Democracy et al. in support of respondent. With him on the brief was *Harold Feld*.

Before: GINSBURG and KAVANAUGH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

Separate opinion concurring except as to Part II.C filed by *Senior Circuit Judge* RANDOLPH.


GINSBURG, *Circuit Judge*: Comcast Corporation and several intervenors involved in the cable television industry petition for review of a rule in which the Federal Communications Commission capped at 30% of all subscribers the market share any single cable television operator may serve. We agree with Comcast that the 30% subscriber limit is arbitrary and capricious. We therefore grant the petition and vacate the Rule.

## I. Background

The Cable Television Consumer Protection and Competition Act of 1992 directed the FCC, "[i]n order to enhance effective competition," 47 U.S.C. § 533(f)(1), to

> prescrib[e] rules and regulations ... [to] ensure that no cable operator or group of cable operators can unfairly impede, either because of the size of any individual operator or because of joint actions by a group of operators of sufficient size, the flow of video programming from the video programmer to the consumer.

*Id.* § 533(f)(2)(A). The Commission is to "make such rules and regulations reflect the dynamic nature of the communications marketplace." *Id.* § 533(f)(2)(E).

Several cable operators immediately challenged certain provisions of the Act, in particular arguing the subscriber

limit provision was facially unconstitutional as a content-based restriction of speech. *See Daniels Cablevision, Inc. v. United States*, 835 F. Supp. 1 (D.D.C. 1993), *rev'd in part sub nom. Time Warner Entm't Co. v. United States* (*Time Warner I*), 211 F.3d 1313 (D.C. Cir. 2000). We "conclude[d] that the subscriber limits provision is not content-based." *Time Warner I*, 211 F.3d at 1318. Applying "intermediate, rather than strict scrutiny," *id.*, we upheld the relevant provision of the Act because the plaintiff "ha[d] not demonstrated that the subscriber limits provision is on its face either unnecessary or unnecessarily overburdensome" to speech protected by the First Amendment to the Constitution of the United States, *id.* at 1320.

In 1993 the Commission first exercised its rulemaking authority and set the subscriber limit at 30%. Much has changed in the subscription television industry since 1993: The number of networks has increased five-fold and satellite television companies, which were bit players in the early '90s, now serve one-third of all subscribers. Meanwhile, the FCC has twice changed the formula it uses to determine the maximum number of subscribers a cable operator may serve, but the subscriber limit has always remained at 30%.

In 2001 we considered a petition for review of a then newly revised version of the 30% subscriber limit. *Time Warner Entm't Co. v. FCC* (*Time Warner II*), 240 F.3d 1126 (2001). Then, as now, the Commission established the subscriber limit through an "open field" analysis, in which the agency "determines whether a programming network would have access to alternative [video programming distributors] of sufficient size to allow it to successfully enter the market, if it were denied carriage by one or more of the largest cable operators." *Fourth Report and Order and Further Notice of Proposed Rulemaking*, 23 F.C.C.R. 2134, 2143, 73 Fed. Reg.

11,048 (2008) (*Fourth Report*). In *Time Warner II* we described the formula then used by the FCC:

> [T]he FCC determines that the average cable network needs to reach 15 million subscribers to be economically viable. This is 18.56% of the roughly 80 million ... subscribers, and the FCC rounds it up to 20% of such subscribers. The FCC then divines that the average cable programmer will succeed in reaching only about 50% of the subscribers linked to cable companies that *agree* to carry its programming, because of channel capacity, programming tastes of particular cable operators, or other factors. The average programmer therefore requires an open field of 40% of the market to be viable (.20/.50 = .40).
>
> Finally, to support the 30% limit that it says is necessary to assure this minimum, the Commission reasons as follows: With a 30% limit, a programmer has an open field of 40% of the market even if the two largest cable companies deny carriage, acting individually or collusively.

240 F.3d at 1131 (internal citations and quotation marks omitted). As is apparent from this description, in order to use the open field approach, the Commission must assign values to three variables: (1) The "minimum viable scale," which is the number of viewers a network must reach to be economically viable; (2) the relevant market, which is the total number of subscribers; and (3) the "penetration rate,"

which is the percentage of viewers the average cable network reaches once a cable operator decides to carry it.

In establishing the subscriber limit we reviewed in *Time Warner II*, the Commission had sought to ensure a minimum open field of 40% and reasoned that a 30% cap, rather than the seemingly obvious 60% cap, was necessary because the Commission was concerned about the viability of a video programming network if the two largest cable operators denied it carriage. *Id.* at 1132. We granted the petition because the record contained no evidence of cable operators' colluding to deny a video programmer carriage and "the legitimate, independent editorial choices" of two or more cable operators, *id.* at 1135, could not be said to "unfairly impede, either because of the size of any individual operator or because of joint actions by a group of operators of sufficient size, the flow of video programming from the video programmer to the consumer," 47 U.S.C. § 533(f)(2)(A). We directed the agency on remand to consider how the increasing market share of direct broadcast satellite (DBS) companies, such as DirecTV and Dish Network, diminished cable operators' ability to determine the economic fate of programming networks. *Time Warner II*, 240 F.3d at 1134.

On remand, the Commission adopted the current version of the 30% subscriber limit. The Rule here under review was designed to ensure that no single cable operator "can, by simply refusing to carry a programming network, cause it to fail." *Fourth Report*, 23 F.C.C.R. at 2154. Based upon the record before the court in *Time Warner II*, the subscriber limit under this standard could not have been lower than 60%. 240 F.3d at 1136. Based upon the present record, however, the Commission concluded no cable operator could safely be allowed to serve — *mirabile dictu* — more than 30% of all subscribers. *Plus ça change, plus c'est la même chose?*

In re-calculating the minimum viable scale, the Commission relied upon a study's finding regarding the number of viewers a cable network needed to reach in order to have a 70% chance of survival after five years, using data on the survival of cable networks between 1984 and 2001. *Fourth Report*, 23 F.C.C.R. at 2162. Based upon the study, the FCC found the minimum viable scale was 19.03 million subscribers, about four million more than the agency had found were necessary in 1999.

To determine the total number of subscribers, the FCC counted all cable subscribers and DBS customers, totaling approximately 96 million (up from 80 million in 1999). *Id.* at 2166-67. In re-calculating the penetration rate, the Commission observed, "many, if not most, new cable networks are placed on a digital tier. A consequence of being placed on a digital tier versus one of the basic levels of service ... is a much lower penetration rate." *Id.* at 2163. Using an in-house study of the tiering and subscribership data for a sample of cable operators and a linear regression model, the Commission determined the penetration rate of the average network was 27.42%, or slightly more than half the 50% penetration rate it found in 1999. *Id.* at 2164.[*]

From these data, the Commission calculated that a video programming network, to be viable, required an open field of 70% (up from 40% in 1999). Therefore, no cable operator could serve more than 30% of all subscribers.

---

[*] This result is somewhat surprising when one considers the increase in the channel capacity of the industry over the last decade: The FCC has found it is now more difficult for a network to reach the homes of any given number of viewers than it was in 1999, when cable operators had fewer channels to fill.

Although the Commission recognized "that competition in the downstream market [especially from DBS companies] may affect the ability of a large cable operator to prevent successful entry by a programming network, and that [the] open field analysis does not directly measure this," it decided not to adjust the subscriber limit to account for such competition because doing so would be "quite difficult." *Id.* at 2167-68. The FCC then gave four reasons it did not regard competition from DBS companies as significant: Customers are reluctant to switch from cable service to DBS because (1) switching is costly; and (2) cable operators offer non-video services, such as telephone and internet access, that are not available with DBS; and (3) "video programming is a product, the quality of which cannot be known with certainty until it is consumed." Additionally, (4) "[c]ompetitive pressures from DBS will not provide any assistance to networks that," not having a contract with the largest cable operator, are unable to "launch due to a lack of financing." *Id.* at 2168-69.

Comcast now petitions for review of the Commission's latest version of the 30% subscriber limit. The National Cable & Telecommunications Association, Bright House Networks, the Cable Television & Communications Association of Illinois, Cablevision Systems Corporation, the Indiana, Michigan, Minnesota, and Missouri Cable Telecommunications Associations, and Time Warner have intervened in support of Comcast's petition. The CCTV Center for Media & Democracy, United Church of Christ, and the Center for Creative Community (collectively CCTV Intervenors) have intervened in support of the FCC.

## II. Analysis

Comcast suggests the CCTV Intervenors lack standing and argues the 30% subscriber limit is unconstitutional, outside the scope of the FCC's statutory authority, and arbitrary, capricious, and unsupported by substantial evidence. The Commission suggests Comcast lacks standing and, of course, defends the 30% limit on all fronts.

### A. Standing

The "irreducible constitutional minimum of standing contains three elements": (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Commission argues we must dismiss the petition because Comcast has failed to show it has suffered a concrete injury in fact that is "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks omitted). Similarly, Comcast claims the CCTV Intervenors cannot point to an actual or imminent injury they would suffer if the 30% subscriber limit were lifted.

Comcast argues it is injured because the 30% subscriber limit "unduly restrict[s] its opportunity to grow internally and make economically efficient acquisitions." Pet. Br. 20. In support of the latter point, the Company invokes the Declaration of a Senior Vice President, who states that "[h]ad the horizontal ownership cap not been imposed by the FCC, Comcast would have seriously pursued further negotiations and due diligence with respect to" a specific but unidentified transaction. *Pick Decl.* at 2. This declaration is sufficient to support Comcast's standing pursuant to *Fox Television Stations, Inc. v. FCC* (*Fox I*), 280 F.3d 1027, 1037 (D.C. Cir.), *modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) (finding standing where cable operator alleged Rule

prevented it from acquiring television stations but failed "to identif[y] any specific transaction it would have consummated but for the ... Rule").

The CCTV Intervenors argue they will be harmed if a cable operator is allowed to serve more than 30% of all subscribers because such an operator could use its market position to restrict consumers' access to some cable networks. We need not decide whether this alleged harm is too "conjectural or hypothetical" to support standing, however, because "if one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case." *Ry. Labor Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993). The CCTV Intervenors have raised precisely the same issues and made essentially the same arguments as has the Commission. Whether the CCTV Intervenors participate in the case therefore cannot affect the merits.

B. The 30% Subscriber Limit

We may set aside the Commission's decision "only if [it] was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Mission Broad. Corp. v. FCC*, 113 F.3d 254, 259-60 (D.C. Cir. 1997) (quoting 5 U.S.C. § 706(2)(A)). We will not do so if the agency "examined the relevant data and articulated a satisfactory explanation for its action." *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 968 (D.C. Cir. 1999) (internal quotation marks omitted).[**]

---

[**] Comcast need not wait for the FCC to enforce the Rule against it for Comcast's claim to be ripe. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148-53 (1967); *see also Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1035, 1040-42 (D.C. Cir. 1991). The record in this case is sufficiently developed for the court to determine whether the subscriber limit is invalid.

Whether a cable operator serving more than 30% of subscribers can exercise "bottleneck monopoly power," *Turner Broad. Sys. v. FCC* (*Turner I*), 512 U.S. 622, 661 (1994), depends, as we observed in *Time Warner II*, "not only on its share of the market, but also on the elasticities of supply and demand, which in turn are determined by the *availability* of competition." 240 F.3d at 1134. A cable operator faces competition primarily from non-cable companies, such as those providing DBS service and, increasingly, telephone companies providing fiber optic service. As Comcast points out, DBS companies alone now serve approximately 33% of all subscribers. Recognizing the growing importance particularly of DBS, in *Time Warner II* we said in no uncertain terms that "in revisiting the horizontal rules the Commission will have to take account of the impact of DBS on [cable operators'] market power." *Id.*

Of the three aspects of the Commission's open field model — minimum viable scale, total number of subscribers, and penetration rate — only the total subscribers measure fully takes account of the competition from DBS companies and companies offering fiber optic services. As Comcast points out, the measure of minimum viable scale relies upon data from 1984-2001 and, as a result, fails to consider the impact of DBS companies' growing market share (from 18% to 33%) over the six years immediately preceding issuance of the Rule, as well as the growth of fiber optic companies. The penetration rate calculation, by the Commission's own admission, leaves out data regarding DBS penetration — an omission the FCC attempts to justify with the question-begging assertion that such data would not have materially changed the penetration rate.

Comcast argues the Commission has offered no plausible reason for its failure to heed our explicit direction in *Time Warner II* to consider the competitive impact of DBS companies. Instead the Commission made the four non-empirical observations we enumerated above. As for the first, transaction costs undoubtedly do deter some cable customers from switching to satellite services, but Comcast points to record evidence that almost 50% of all DBS customers formerly subscribed to cable; in the face of that evidence, the Commission's observation that cost may deter some customers from switching to DBS is feeble indeed. With regard to the second — that some cable consumers may be reluctant to switch to a satellite television service because, unlike cable companies, DBS companies do not offer internet and telephone services — the Commission does not point to any evidence tending to show these inframarginal customers are numerous enough to confer upon cable operators their supposed bottleneck power over programming. Moreover, as Comcast points out, both DirecTV and Dish Network have partnered with telephone companies to offer bundled DBS and telephone services.

The Commission's third justification — that consumers will not switch providers to access new programming because they cannot know the quality of the programming before consuming it — warrants little discussion. As Comcast points out, there is no record support for this conjecture. In any event, it is common knowledge that new video programming is advertised on other television stations and in other media, and can be previewed over the internet, thus providing consumers with information about the quality of competing services. The FCC's fourth reason — that without its subscriber cap an upstart network will have trouble securing financing unless it has a contract with a cable company serving more than 30% of the market — is no more

convincing than the other three when one recalls DBS companies already serve more than 30% of the market.

Finally, we note the Commission's observation that assessing competition from DBS companies is difficult — possibly true even if unexplained — does not justify the agency's failure to consider competition from DBS companies in important aspects of its model. That a problem is difficult may indicate a need to make some simplifying assumptions, *see Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1264 (D.C. Cir. 1994), but it does not justify ignoring altogether a variable so clearly relevant and likely to affect the calculation of a subscriber limit — not to mention one the court had directed the agency to consider.

Comcast, on the other hand, points beyond DBS companies' growing market share to their exclusive arrangements with certain highly sought after programmers as evidence that competition has led and will likely continue to lead subscribers to switch services. Indeed, Commissioner McDowell pointed out in dissent that, as of the date of the Fourth Report, DirecTV and Dish Network each served more customers than any cable company save Comcast itself. *Fourth Report*, 23 F.C.C.R. at 2228. Comcast also points to evidence that the number of cable networks has increased by almost 500% since 1992 and has grown at an ever faster rate since 2000, and that a much lower percentage of cable networks are vertically integrated with cable operators than was the case when the Congress passed the 1992 Act. There can be no doubt that consumers are now able to receive far more channels than they could in 1999, let alone 1992.

In sum, the Commission has failed to demonstrate that allowing a cable operator to serve more than 30% of all cable subscribers would threaten to reduce either competition or

diversity in programming. First, the record is replete with evidence of ever increasing competition among video providers: Satellite and fiber optic video providers have entered the market and grown in market share since the Congress passed the 1992 Act, and particularly in recent years. Cable operators, therefore, no longer have the bottleneck power over programming that concerned the Congress in 1992. Second, over the same period there has been a dramatic increase both in the number of cable networks and in the programming available to subscribers.

In view of the overwhelming evidence concerning "the dynamic nature of the communications marketplace," 47 U.S.C § 533(f)(2)(E), and the entry of new competitors at both the programming and the distribution levels, it was arbitrary and capricious for the Commission to conclude that a cable operator serving more than 30% of the market poses a threat either to competition or to diversity in programming. Considering the marketplace as it is today and the many significant changes that have occurred since 1992, the FCC has not identified a sufficient basis for imposing upon cable operators the "special obligations," *Turner I*, 512 U.S. at 641, represented by the 30% subscriber limit. We conclude the Commission has failed to "examine[] the relevant data and articulate[] a satisfactory explanation for its action," *Fresno Mobile*, 165 F.3d at 968, and hold the 30% subscriber cap is arbitrary and capricious.[***]

C.  Remedy

Comcast asks us to vacate the 30% subscriber limit. "An inadequately supported rule ... need not necessarily be

---

[***] In consequence, we do not reach the petitioner's constitutional challenge to the Rule.

vacated." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993). Rather, "[t]he decision whether to vacate depends on the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.* at 150-51 (internal quotation marks omitted). In the past we have not hesitated to vacate a rule when the agency has not responded to empirical data or to an argument inconsistent with its conclusion. *Ill. Pub. Telecomm. Ass'n v. FCC (Ill. Pub. I)*, 117 F.3d 555, 564 (1997); *see also Ill. Pub. Telecomm. Ass'n v. FCC (Ill. Pub. II)*, 123 F.3d 693, 693-94 (D.C. Cir. 1997) (explaining court in *Ill. Pub. I* intended to vacate rule).

The Commission's dereliction in this case is particularly egregious. In the previous round of this litigation we expressly instructed the agency on remand to consider fully the competition that cable operators face from DBS companies. *Time Warner II*, 240 F.3d at 1134. The omission of this consideration was a major failing of the FCC's prior attempt to justify the 30% cap. The Commission nonetheless failed to heed our direction and we are again faced with the same objections to the rationale for the cap. It is apparent that the Commission either cannot or will not fully incorporate the competitive impact of DBS and fiber optic companies into its open field model. We have no trouble concluding, therefore, that vacatur is indicated by the first factor in *Allied-Signal*, "the seriousness of the [Rule's] deficiencies," 988 F.2d at 150. *See Fox I*, 280 F.3d at 1053 (vacating regulation as "a hopeless cause").

Vacatur is also indicated by the second *Allied-Signal* factor, *viz.*, whether vacatur is likely to be unduly disruptive of the agency's regulatory program. 988 F.2d at 150-51. Although vacatur will eliminate the subscriber limit, cable

operators will remain subject to, and competition will be safeguarded by, the generally applicable antitrust laws. *Cf. Natural Res. Def. Council v. EPA*, 489 F.3d 1364, 1375 (D.C. Cir. 2007) (holding vacatur was not unduly disruptive because parties were subject to other environmental regulations); *see also Chamber of Commerce v. SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006) (considering whether vacatur would disrupt regulated industry and customers pursuant to second *Allied-Signal* criterion).

Of course, the second *Allied-Signal* factor is weighty only insofar as the agency may be able to rehabilitate its rationale for the regulation. 988 F.2d at 150-51. The Commission having twice tried and twice failed to justify the 30% cap, we do not think that prospect looms large. Were the Rule left in place while the FCC tries a third time to rationalize the cap, however, it would continue to burden speech protected by the First Amendment. "Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner I*, 512 U.S. at 636. Because "it is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas ... the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences through the medium of broadcasting … may not constitutionally be abridged either by Congress or by the FCC." *FCC v. League of Women Voters*, 468 U.S. 364, 377-78 (1984) (internal alterations omitted).

The 30% subscriber cap has limited the ability of cable operators to communicate with the public for some 16 years despite our determination eight years ago that a prior version of the Rule was unconstitutional. *See Time Warner II*, 240 F.3d at 1128 ("the FCC has not met its burden under the First

Amendment"). In light of the changed marketplace, the Government's justification for the 30% cap is even weaker now than in 2001 when we held the 30% cap unconstitutional. As the Supreme Court has observed, "the broadcast industry is dynamic in terms of technological change; solutions adequate a decade ago are not necessarily so now, and those acceptable today may well be outmoded 10 years hence." *Columbia Broad. Sys. v. Democratic Nat'l Comm.*, 412 U.S. 94, 102 (1973). To leave the Rule in place while the Commission tries yet again to justify it would be to ignore this crucial fact about the nature of the video industry.

## III. Conclusion

We hold the 30% subscriber limit is arbitrary and capricious because the Commission failed adequately to take account of the substantial competition cable operators face from non-cable video programming distributors. The petition for review is therefore granted and the subscriber limit is, accordingly,

*Vacated.*

RANDOLPH, *Senior Circuit Judge*, concurring: I continue to believe that whenever a reviewing court finds an administrative rule or order unlawful, the Administrative Procedure Act requires the court to vacate the agency's action. *Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (separate opinion of Randolph, J.).

Section 706(2)(A) of the APA could not be clearer: a court faced with an arbitrary and capricious agency rule or order "shall hold unlawful and set aside" that agency action. "Set aside" means vacate, according to the dictionaries and the common understanding of judges, to whom the provision is addressed. And "shall" means "must." I see no play in the joints.[1] The APA itself contains no exception, which is why

---

[1] One commentator, relying on *Hecht Co. v. Bowles*, 321 U.S. 321 (1944), argues for a different interpretation of § 706(2)(A). Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 DUKE L.J. 291, 310-11 (2003). The statute in *Hecht* provided that upon a showing of a violation of the act, an injunction "or other order" shall be granted. 321 U.S. at 321-22. The Court construed this as not requiring an injunction. "Other order" could, the Court said, be an order just keeping the case on the docket. *Id.* at 328. As part of its reasoning the Court invoked the background of several centuries of equity practice, and the "historic" office of the injunction. To make injunctions mandatory would be a departure from this long history. *Id.* at 329-30.

There are several reasons why I do not think the argument based on *Hecht* carries the day. In the first place, the premise of the argument is shaky at best. Unlike the situation in *Hecht*, judicial review of agency rulemaking is not a traditional proceeding in equity. Nor do I believe that a challenge to an agency rule in an enforcement action seeking a fine or a penalty is in the nature of an action in equity.

Furthermore, the *Hecht* canon – if it is that – does not preserve a court's remedial discretion even in injunction actions if Congress has limited the discretion in clear terms. *See Miller v. French*, 530 U.S.

arbitrary, capricious, or otherwise unlawful agency action must be set aside "[i]n all cases." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971). It is also why this court has repeatedly cited § 706(2)(A) in recognition that it "must" – not may – set aside such illegal agency action.[2]

It is true that occasionally our court has remanded invalid rules without vacating them. But none of those decisions made even the slightest attempt to square the remand-only disposition with § 706(2)(A). Remanding without vacating often seems to occur without analysis and, perhaps, inadvertently. We traditionally sign off opinions with "So ordered" or "Affirmed" or "Dismissed" or even occasionally "Reversed," always in italics, flush right. Sometimes, I suspect, not much attention is

---

327, 340-41 (2000). To my mind, § 706(2)(A) is stated in clear terms. The statute in *Hecht*, on the other hand, did not clearly limit judicial discretion; in fact, it clearly contemplated that courts would issue "other order[s]" besides injunctions. *Hecht*, 321 U.S. at 328.

[2] *See, e.g.*, *Owner-Operator Ind. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 198 (D.C. Cir. 2007); *Am. Fed'n of Gov't Employees, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 354 (D.C. Cir. 2007); *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006); *Exxon Mobil Corp. v. FERC*, 430 F.3d 1166, 1172 (D.C. Cir. 2005); *Southern Co. Servs., Inc. v. FERC*, 416 F.3d 39, 46-47 (D.C. Cir. 2005); *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1256 (D.C. Cir. 2005); *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001); *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1194-95 (D.C. Cir. 2000); *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 8 (D.C. Cir. 2000); *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221-22 (D.C. Cir.1999); *Exxon Co., USA v. FERC*, 182 F.3d 30, 37 (D.C. Cir. 1999); *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir.1996); *Mobile Commc'ns Corp. of Am. v. FCC*, 77 F.3d 1399, 1408 (D.C. Cir. 1996); *Steel Mfrs. Ass'n v. EPA*, 27 F.3d 642, 646 (D.C. Cir. 1994); *see also Checkosky*, 23 F.3d at 492 n.35 (listing numerous pre-1994 cases).

paid to the large difference between "Remanded" and "Vacated and remanded."

The opinion in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission* at least identified some factors that might make vacating a rule more or less attractive. 988 F.2d 146, 150-51 (D.C. Cir. 1993). But the relatively few cases attempting to apply *Allied-Signal* are difficult to reconcile. *See* Kristina Daugirdas, Note, *Evaluating Remand Without Vacatur: A New Judicial Remedy for Defective Agency Rulemakings*, 80 N.Y.U. L. REV. 278, 293-97 (2005). And like other remand-only decisions, *Allied-Signal* failed to parse the language of § 706(2)(A).

It is easy to postulate cases in which vacating an agency rule or order might have dire consequences. But the prospect is not a reason to disregard the command of § 706(2)(A). As I explained in *NRDC v. EPA*, 489 F.3d 1250, 1263 (D.C. Cir. 2007) (concurring opinion), the losing agency may always file a post-decision motion for a stay of the mandate showing why its unlawful rule or order should continue to govern until proceedings on remand are completed. *See* D.C. Cir. R. 41(a)(2); *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006); *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001); *U.S. Tel. Ass'n v. FCC*, 188 F.3d 521, 531 (D.C. Cir. 1999). This approach has several advantages over remand without vacatur.

For one, it preserves the adversarial process. The briefs of the parties rarely discuss what remedy the court should impose if the agency loses. This is understandable. "It may be impossible for petitioners, agencies, or intervenors to anticipate exactly how the court's decision will come out. There may be challenges to many rules or many aspects of one rule. The court may uphold some and reject others. Different consequences can

result from different combinations. Besides, agencies do not relish anticipating a loss. No litigant does. To require the parties to address the subject in each case would waste their time and the court's in all cases in which the agency prevails. . . . The upshot is that remand-only decisions are being made without sufficient information, which is one of the main reasons the cases are so difficult to reconcile." *NRDC v. EPA*, 489 F.3d at 1263 (Randolph, J., concurring).

By contrast, post-decision stay motions allow the court to hear from all parties before deciding whether to allow the unlawful rule to remain in place. Our decisions on stay motions are likely to be far more consistent than our decisions to remand without vacating because we will be applying familiar and long-standing principles – that is, irreparable harm, likelihood of success, prejudice, and the public interest.

In addition, a stay with reasonable time limits gives the agency an incentive to avoid unnecessary or prejudicial delay. A remand-only disposition leaves the unlawful rule in place and allows agencies to postpone responding to the court's merits decision. Agencies do not necessarily give remand-only decisions high priority and may delay action for lengthy periods. *See* Daugirdas, *supra*, at 302-04.

Motions for stays also properly allocate the burdens among the parties. The losing party – the agency – would have the burden of convincing the court that the unlawful regulation should continue to govern the winning party while the agency responds to the court's ruling.

I would therefore treat § 706(2)(A) as mandatory rather than discretionary and would vacate without evaluating the factors mentioned in the majority opinion.